## STATE ex rel. DOUGLAS *vs.* HASTINGS.

ALTERNATIVE WRIT OF MANDAMUS.

Heard August 27.]                               [Decided Oct. 15, 1860.

*Mandamus—Counties—Swamp Lands—Constitutional Law.*

Where a county was indebted to the state for its proportion of taxes, and the State Treasurer had in his possession moneys belonging to the county, arising from sale of swamp lands: Held, that the treasurer cannot retain the money in his hands to pay the state indebtedness, under the act of April 30, 1856.

The proceeds of the sales of the swamp and overflowed lands, cannot be diverted from the purposes of the grant by the state authorities, under the constitution of this state.

This was an action commenced by the treasurer of the county of Outagamie, to compel the State Treasurer to pay over the amount due the county from the sales of the swamp lands in that county. The State Treasurer answered that the county was indebted to the state the amount claimed, and, therefore, he had refused to pay, &c. The relator demurred to this answer.

*Geo. H. Myers,* for the relator.

*J. H. Howe,* Attorney General, for the respondent.

*By the Court,* DIXON, C. J. By the first section of chapter 67, of the General Laws, of 1858, incorporated into chapter 29 of the Revised Statutes of that year, 337, it is enacted that for the purpose of carrying out the intention of the act of Congress, entitled "An act to grant to the State of Arkansas, and other states, the swamp and overflowed lands within their limits," and for the further purpose of enhancing to the purchasers, the value of such swamp and overflowed lands, as have been, or may hereafter be purchased of this state, fifty

per cent. of the net proceeds of the sales of the swamp and overflowed lands granted to this state by the act of Congress aforesaid, shall be, and the same is thereby set apart as a separate fund, to be entitled the "Drainage Fund," which fund shall be devoted to the drainage and reclamation of said swamp and overflowed lands. The second section provides that the principal of said fund shall be loaned in the same manner, and subject to the same regulations as the school fund. The third section declared that all interest then due, or thereafter to become due to said fund, on account of sales or loans theretofore or thereafter made, should be annually distributed to the several counties in the state, in proportion to the amount received from the sales of said swamp lands in said counties, at the same time, and in the same manner as is provided by law for the distribution of the school fund income, to be expended under the direction of the several boards of county supervisors of such counties, for the drainage and reclamation of swamp and overflowed lands, as thereinafter provided.

The first section of chapter 24 of the Revised Statutes,.declares that the income of the school fund, which shall be received up to the 10th day of March in each year, shall be distributed annually between the 10th and 15th days of March, in the same year, or as soon thereafter as practicable among the several counties entitled thereto.

Within the time thus prescribed by law, there was, in March, 1860, distributed and set apart by the commissioners to the county of Outagamie, as the annual proportion of the drainage fund income, received prior to the 10th day of that month, the sum of $1,335,64, of which the relator, as treasurer thereof, was on the 26th day of April, 1860, duly notified by the respondent as the treasurer of the state. On the 2d of June following, the relator, in his said capacity of treasurer of said county demanded payment of the money so distributed and set

apart, which was refused by the respondent. Thereupon this relation was filed, and an alternative writ of mandamus issued.

In return to the writ, the respondent, who appears by the Attorney General, after admitting all the material facts set forth in the relation, sets up, by way of justification or defense, several matters or items of account between the state and the county, the details of which it is unnecessary for us to notice here, the result being that the county was, at the time of filing the relation, largely in arrear, and indebted to the state for the unpaid State taxes due and payable from the county for the years 1858 and 1859, and perhaps previous years.

Here we may properly notice a question growing out of the averments of the return, and which was discussed at bar, our views of which have led us to the conclusion that the county is thus indebted to the state. It is alleged in the relation that the county is not so in arrear and indebted. This is denied in the return, and a statement of the account between them given. By section 5, chapter 15 of the Revised Statutes of 1849, lands contracted to be sold by the state, and not conveyed, were assessed to the person holding the contract or certificate of purchase, or to the occupants as personal property. By chapter 92, General Laws, 1853, that section was repealed, and the assessment and collection of taxes on such lands regulated substantially by chapter 24, General Laws of 1859, except that the unpaid, or returned taxes, were not declared to be a set off to the state taxes due from the counties to the state.

The last named act provided that if the taxes on any such lands should not be paid on or before the first day of April next succeeding the return of said lands to the county treasurer of any county, with interest at 12 per cent. from the first day of January preceding, the county treasurer should im-

mediately forward certified lists of such lands, on which the taxes remained unpaid, with the interest added thereto, to the State Treasurer, who should immediately place the same to the credit of the proper county, and such credit should be a valid offset to an equal amount of state tax charged to said county. The credits which the county of Outagamie had received, and which it was claimed it was entitled to receive for lists returned under the provisions of this act, at the time the payment of the money, as above stated, was refused, and at the time this action was commenced, considerably exceeded the amount previously due from the county to the state for state taxes.

The latter act and chapter 223, laws of 1859, by which it was amended, were repealed by chapter 306, laws of 1860. By this act the provisions of the act of 1859 touching the collection of taxes upon such lands, are substantially re-enacted, except that it is provided that the State Treasurer shall give the counties credit only so fast as such taxes shall actually be collected by him, the same to be computed and entered quarterly. The 8th section declares that the amount of such taxes with which the counties had previously been credited and which remained unpaid at the time of its passage, shall be charged back to such counties respectively.

The return shows that no credit was ever in fact given to. the county of Outagamie for the taxes, which were returned by it during the time that the act of 1859 was in force. It was insisted on the part of the relator that the act of 1859, so far as returns had actually been made under it, was in the nature of a contract between the county and the state, which no subsequent legislation would modify or impair, and that although the credits had not yet been made, it was the duty of the treasurer to make them, and the court should treat them as if the county had actually been credited. We think it is immaterial whether it had or had not been credited, being of

opinion that if it had, the treasurer would be authorized to charge the credits back, under the act of 1860. It was not a contract or in the nature of one, but a mere regulation of the internal police of the state which the legislature might change or repeal at its pleasure. It was a question as to the manner in which such taxes should be collected, whether by the officers of the several counties or towns, or those of the state at large, and the legislature could impose the duty on either, and having done so, it could transfer it from those of the one to those of the other. The fact that credits were directed to be given to the counties in advance of the actual receipt of the moneys, gave the counties so far as the moneys remained uncollected no vested rights. They had incurred no obligations —had parted with nothing on account of that provision. The legislature could have provided, as it had done previously, and has since done by the act of 1860, that such returns should be made without the giving of such credits, as well as with; and there seems no room to doubt its power to direct those which were then unpaid to be charged back to the counties to which they had been credited.

There being thus an unpaid balance of state taxes due from the county to the state, exceeding in amount the sum which was set apart to the county as its proportion of the income of the drainage fund for the year 1860, the respondent claims the right to withhold this distributive share of the drainage fund income by way of set off to such unpaid state taxes, or until the same shall be paid. This is the main question involved in the present demurrer, and upon it we are of opinion that the position of the respondent is clearly untenable. There is not, to our knowledge any act by which the legislature has attempted to confer upon him such authority. The act of Congress of September 28th, 1850, by virtue of which the swamp and overflowed lands were granted to the state, expressly provided "That the proceeds of said

lands, whether from sale or direct appropriation in kind, shall be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid." The 10th section of Article VIII of the constitution of this state declares that "whenever grants of land or other property shall have been made to the state, especially dedicated by the grant to particular works of internal improvement, the state may carry on such particular works, and shall devote thereto the avails of such grants, and may pledge or appropriate the revenue derived from such works in aid of their completion."

In the act of April 30, 1858, first above referred to, the legislature, acting within the line of its power and duty, through the agency of the boards of supervisors of the several counties, directed the application of fifty per cent. of the net proceeds of the sales of such swamp and overflowed lands to the drainage and reclamation thereof. That act is a legislative declaration or recognition that at least so much of such net proceeds, are necessary to be appropriated to the purposes specified in the act of Congress, and as long as it remains in force on our statute books, as it still does, we think it is conclusive of the existence of such a necessity, and that by virtue of the language of the grant, and of the constitution which we have quoted, it does not lie in the power of the State Treasurer or the courts, at the same time to divert such proceeds to other objects. This proposition seems to us too plain to be made clearer by argument. The attempt of the State Treasurer to retain the funds belonging to the county for those purposes, as an offset or payment of so much money due from the county to the state for state taxes, if sustained, would be an obvious diversion of them to other objects, and is therefore unauthorized by law.

The demurrer to the return of the respondent is sustained, and a peremptory writ of mandamus awarded.