## THE WEST WISCONSIN RAILWAY COMPANY VS. THE BOARD OF SUPERVISORS OF TREMPEALEAU COUNTY.

CONSTITUTIONAL LAW.   (1–5) *Reserved power to alter charters.*
TAXATION.   (6) *Power of state to tax lands granted by congress for aid of railroads.*

1. Where the charter of a corporation, granted by a state legislature, or the constitution, or a law of the state, in force when such charter is granted, reserves to the legislature the power to alter, amend or withdraw any franchise or privilege granted by such charter, this reservation qualifies the grant; and a subsequent exercise of the reserved power is not within the prohibition of the federal constitution, as an act impairing the obligation of a contract.

2. Ch. 324, Laws of 1864, in substance, enacted that all lands thereafter acquired by the plaintiff company, and of which the title in fee should become vested in it, pursuant to a certain act of congress and certain laws of this state, should be *exempt from all taxation* for ten years after the passage of the act; and that in case any such land should be sold, contracted to be sold, leased or conveyed by the company, they should immediately become subject to taxation; but that they might be mortgaged to raise funds for building the railroad without being subject to taxation for the period aforesaid.   By ch. 104, Laws of 1870, the time of exemption was extended for ten years as to such lands as should remain unsold by the company, upon condition that the company should complete the road within two years. By the terms of certain acts passed by the legislature in 1871, the provisions of said exempting acts, so far as they applied to lands in Trempealeau county, were *repealed.*   Sec. 1, art. XI of the state constitution, provides that all general laws or special acts under which corporations without banking powers are created, "may be altered or repealed by the legislature at any time after their passage." *Held*, that the repealing acts of 1871, above mentioned, are valid.

[3. COLE, J., denies, upon general grounds, the power of a state legislature to grant or barter away, without recall, the right of the state to impose taxes.   But it was not necessary to determine that question in this case.]

4. The original corporators of the company, its stockholders, and the purchasers of its bonds secured by mortgage on the lands so exempted from taxation, acquired their respective rights with knowledge of, and subject to, the reserved right of the legislature.

[5 Per COLE, J.   It may be conceded that the legislature, under the pow-

VOL, XXXV.—17

ers reserved to it by the constitution, could not divest the plaintiff company of its *title to the land* after it was earned, nor take away *property* which it had acquired.]

6. The fact that the lands in question were granted by congress, subject to the disposal of the state legislature, *to aid in the construction of the railroad* described in the act, *and for no other purpose*, does not deprive the legislature of the power to tax them after they have been earned by, and become the property of, the railroad company.

APPEAL from the Circuit Court for *Trempealeau* County.

Action to cancel certain tax certificates held by the defendant county upon lands owned by the plaintiff in said county.

It appears from the allegations of the complaint, which were sustained by the finding of the court, that the lands covered by such certificates were a portion of those granted by the United States in 1856 to the state of Wisconsin to aid in the construction of railroads; that they were, by chapter 243, P. & L. Laws of 1863, conferred by the state upon the Tomah & Lake St. Croix Railroad Company, the name of which was, in 1866, changed to the *West Wisconsin Railway Company*; that such company was, by its act of incorporation, and acts amendatory thereof, authorized to borrow money, and issue bonds to run for such length of time as the company should determine, and to secure such bonds by mortgage or deed of trust upon all of its property; that in pursuance of such authority said company, in 1868, issued what were known as its land grant bonds, to the amount of four million dollars, payable fifteen years from date, and, to secure the same, executed a deed of trust, by the terms of which the road-bed, rolling stock, and all lands thereafter to be acquired from the state or the United States, were deeded to trustees, with the provision, among other things, that the lands should be released from time to time for the purpose of sale by the company, and that the avails of such sales should be paid directly to such trustees, to be applied to the payment of said bonds.

It further appears that the proceeds of said bonds, amounting to about three million, two hundred thousand dollars, were

applied by the plaintiff company to the construction and equipment of its road, and were inadequate for the purpose; that said lands were, by the original grant from the state, exempted from taxation for the period of ten years, provided they were not sooner sold by the company; and that by acts of the legislature in 1870, such exemption was extended for ten years more upon condition that the road should be completed within two years, or before May 5, 1872; that the fact of such exemption was advertised extensively by the company as an inducement to the purchase of its bonds, and aided materially in their sale; that after the passage of such latter acts, some $800,000 worth of bonds were sold, principally in Europe, and that the company, upon the strength of said acts, had hastened the construction of their road, incurring large expense in so doing, and completed the same during the month of November, 1871; that as soon as the company had acquired title to any of said lands by the completion of the required section of their road, they had placed them upon the market, and had sold and were selling the same as rapidly as possible, applying the proceeds to the payment of their bonds; that only a small portion of said lands had been sold at the time of commencing the action, and that those described in the complaint were still undisposed of.

By act of the legislature, in 1871, all lands owned by railroads in Trempealeau county and not used for road-bed or depot purposes, were declared subject to taxation; and the lands described in the complaint were accordingly assessed in that year, and in May, 1872, were sold for nonpayment of taxes, the county becoming the holder of the certificates, to cancel which this action was brought.

Upon trial by the court, all of the facts were found as above stated. The court also found that the lands were not used by the company for its road-bed or for depot purposes, and, as conclusions of law, held that they were subject to taxation, and that the company was not, therefore, entitled to the relief

demanded. Judgment was accordingly entered dismissing the complaint; from which judgment the plaintiff appealed.

*John C. Spooner*, for appellant, with *P. L. Spooner* and *H. S. Orton*, of counsel:

1. The authority of the legislature of a state to grant away its right of taxation is well established. *Home of the Friendless v. Rouse*, 8 Wall., 431; *Wilmington Railroad v. Reid*, 13 id., 266; *Raleigh & Gaston R. R. Co. v. Reid*, id., 269. The act of the legislature exempting the lands in question from taxation was an invitation to capitalists to invest their funds in the construction of the road; and while it was an offer which might have been withdrawn or revoked before it had been accepted and obligations incurred upon the strength of it (see *Voight v. Hoeflinger*, 31 Wis., 263), after such acceptance and after contracts had been entered into upon the faith of it, such act became, between the state and the company, an executed contract which could not be revoked. 16 Cal., 194; 5 Cush., 182; 107 Mass., 525. The mortgage was valid, though executed before the company had acquired any title to the lands. The power of so mortgaging them was conferred by the terms of the charter, and it was, besides, the proper and only practicable method of securing the advances necessary for the construction of the road. The mortgage would attach as rapidly as the company acquired the title, and the promise of exemption would then become a part of the contract. 2. Chapter 73, Laws of 1866, is a general statute, and does not control the special provisions of prior acts. 17 Wis., 430; 1 id., 513; 15 id., 256. The deed of trust was not a *conveyance* within the meaning of that statute, because, 1st. Such a construction would render the act inconsistent with the amendments of the charter made at the same session; and 2d. It would render the lands taxable before the railroad company had acquired them. 3. The acts of the legislature exempting these lands from taxation does not infringe the constitutional provision requiring uniformity in taxation. The lands constituted a *trust fund* to

be expended by the state for specific purposes, in dealing with which the state was merely the trustee or agent of the general government; and no right of taxation existed at the time of the contract for exemption. The remission of taxes was the consideration, in part, of a great public work, and the state, instead of losing the tax, receives an equivalent for it. 7 Mich., 89. 4. Section 1, art. XI of the constitution of this state, furnishes no authority for revoking the exemption. The right of the company to such exemption rested upon the same ground as their right to the land itself. It was a quality attached to the land, and, as soon as the company acquired title to the latter, became a vested right of property which could not be touched by the legislature. 15 Wall., 486, 498; id., 519, 522; 13 Gray, 253; 31 Wis., 257. The legislature may take away the *franchises* of a corporation, but not rights acquired by it in the legitimate exercise of those functions. 5. But the right of the company to the exemption may safely rest on higher ground than that of a contract between the company and the state. The lands were, by act of congress of June 3d, 1856, granted to the state to aid in the construction of the railroad mentioned in the act, and *for no other purpose.* The state constitution (art. VIII, sec. 10) requires the state, in case of such a grant, to devote the avails wholly to the particular work specified. The state, then, by accepting the grant, became a trustee thereof for the company, and could not divert any part of the trust estate from the purposes of the trust to its own profit. Until the lands were actually sold by the company, they had not accomplished the purpose of the trust, and taxing them was a diversion of the trust estate, to that extent, from the purposes to which it was dedicated, and was unconstitutional as well as illegal.

*A. W. Newman,* for respondent:

1. This is an action to remove a cloud upon plaintiff's title, and, in order to maintain it, the plaintiff must show an actual and visible possession of the lands, otherwise his remedy is by

ejectment.  R. S. 1858, ch. 141, sec. 3 ; *Hill v. Kricke*, 11 Wis., 442 ; *Dean v. City of Madison*, 9 id., 406 ; ch. 22, Laws of 1859, sec. 31 ; *Jones v. Collins*, 16 Wis., 600 ; *Wals v. Grosvenor*, 31 id., 681.  The proof shows that the lands are wholly unoccupied and unproductive, and the action must, therefore, be dismissed.  2. The taxing power of the state is never presumed to be relinquished, but the intention to relinquish must be clearly established.  *Bank v. Billings*, 4 Pet., 514 ; 10 How. (U. S.), 393.  Such an exemption as claimed by appellants would be a violation of the constitutional provision which requires the rate of taxation to be uniform.  Const. of Wis., art. VIII, sec. 1.  The legislature may prescribe as to what property shall be subject to taxation, but they cannot exempt the property of particular individuals or corporations from the operation of the general rule.  *Durkee v. City of Janesville*, 28 Wis., 464 ; *Knowlton v. Supervisors of Rock Co.*, 9 Wis., 418. 3.  Conceding the right of the legislature to grant the exemption, counsel insists that the lands were not exempt at the time of assessment.  The statute upon which appellant relies in support of the exemption (ch. 324, Laws of 1864), provides that in case any such lands shall be sold or in any manner conveyed by the company, " then such lands shall become subject to taxation immediately, and the exemption provided for by this act shall no longer apply to such lands."  This statute must be strictly construed according to its letter, and any ambiguity must be resolved in favor of the public.  Potter's Dwarris on Stats., 144, rules 10–19 ; *Mundt v. S. & F. R. R. Co.*, 31 Wis., 451 ; *Minturn v. Larue*, 22 How. (U. S.), 435 ; 4 Pet., 415 ; *Mil. & St. P. R'y Co. v. Crawford Co.*, 29 Wis., 123.  The clear grammatical sense of the statute is to exempt the lands from taxation until the company shall see fit to place them upon the market and commence their actual sale ; and after that time, to make them subject to assessment as other lands.  4. The promised exemption was an offer, which, until obligations had been incurred upon the faith of it, the legislature could

revoke, withdraw or qualify. *State ex rel. Voight v. Hoeflinger*; 31 Wis., 263. Ch. 73, Laws of 1866, was a revision of all laws on the subject of exempting railroad land grants, and therefore became a substitute for and worked a repeal of all former laws on the subject, including that under which appellants claim. *Burlander v. Milwaukee & St. P. R'y Co.*, 26 Wis., 76. By this statute, passed before the company had acquired any vested rights under the former acts, the terms of the exemption were considerably altered, among other changes being the omission of the provision allowing the company to mortgage the lands without forfeiting the exemption, which provision became thereby repealed. 5. Under either statute, the conveyance of the lands by trust deed subjected them to taxation. A *mortgage* is a conveyance of lands, and would have made the lands taxable under the statute of 1864, but for the *proviso*. *Croft v. Bunster*, 9 Wis., 503. A *trust deed* is an instrument essentially different from a mortgage, and is not within the proviso. *United States v. Dickson*, 15 Pet., 141; *Marvin v. Titsworth*, 10 Wis., 320; *Encking v. Simmons*, 28 id., 276. At the time of the passage of ch. 104, Laws of 1870, then, the company had no lands for the promised extension of exemption to operate upon. 4. Ch. 386, P. & L. Laws of 1871, repeals all former statutes so far as they relate to the lands in suit, and makes them subject to taxation whether they had previously become so or not. Those statutes were but amendments to appellant's charter — additions to its franchise (*Miller v. The State*, 15 Wall., 478); and the legislature had power, under sec. 1, art. XI of the constitution, to repeal or modify them at its pleasure. *Tomlinson v. Jessup*, 15 Wall., 454.

COLE, J. The plaintiff company demands the cancellation of the tax certificates, on the ground that the lands in question were not subject to taxation in 1871, when the tax was levied, and because such certificates constitute a cloud upon its title. It is claimed by the defendant that the company has not such

an actual, visible possession and occupancy of the lands as entitles it to maintain an action for this equitable relief.    This point becomes immaterial, in view of the conclusion we have reached upon the controlling question in the case, viz., the taxability of the lands.    In our judgment the lands were liable to taxation when the tax was assessed upon them, and consequently might be sold for nonpayment of taxes.

The claim that these lands were exempt from taxation is founded upon ch. 324, Laws of 1864, and the amendatory act of 1870, ch. 104.    These enactments, it is argued, expressly exempted these lands from taxation for a specified period, unless they were leased, sold, or contracted to be sold within that time by the company; and this exemption from taxation, it is insisted, amounts to a contract between the company and state, which is irrevocable in its nature.    By the first section of the law of 1864, it is in substance enacted, that all lands thereafter acquired by the plaintiff company, and of which the title in fee may become vested in said company pursuant to the act of congress approved June 3, 1856, and the laws of the state of Wisconsin granting, etc., shall be exempt from all taxation for ten years from and after the passage of the act.    The second section provided that in case any such lands were sold, contracted to be sold, leased or conveyed by the company, then they should become subject to taxation immediately, and the exemption should no longer apply, with the proviso that the lands might be mortgaged for the purpose of raising funds to build the railroad, without being subject to taxation for the time aforesaid.    By the act of 1870 (ch. 104), the time mentioned in the act of 1864 and the acts supplementary thereto, in relation to the taxation of the lands granted by congress to aid in building the road, was further extended ten years as to such lands as should remain unsold by the company, upon condition that the company should complete its road within two years; but the act was not to apply to Pierce county.

These are the enactments by which it is claimed that the legislature expressly released the right to tax the lands of the company, so as to place it beyond the power of the state to resume or restore it until the period of exemption had expired. In 1871 the legislature did in fact repeal the exemption, so far as the lands in Trempealeau county were concerned (ch. 139, Laws of 1871, also ch. 356, P. & L. Laws of 1871); and it is the validity of these statutes which is called in question, or involved in the case.

The validity of these acts repealing the exemption is mainly rested upon the power reserved to the legislature by section 1, article XI of the constitution, which in terms declares that all general laws or special acts under which corporations without banking powers are created, *may be altered or repealed by the legislature at any time after their passage.* If proper force and effect are given to this constitutional provision, it would seem to afford ample authority for the enactment of the repealing statutes above cited, as it reserved the right to the legislature to amend and revoke all corporate franchises and privileges which it might grant.

In this case the legislature first relinquished the right of taxation, so far as the lands in controversy are concerned, and then subsequently resumed it. But this the learned counsel for the company contend it was not competent for the legislature to do, because it impaired the obligation of a contract which the state had made. The doctrine that a state may grant or bargain away beyond recall the right of taxation, a high political and sovereign power, essential to the very existence of the state, and without which no governmental functions can be exercised or carried on, has always seemed to me to rest upon very unsatisfactory grounds, and I am unable to assent to its general correctness. If the legislature of a state may relinquish for a specified period the right to tax the property of persons or corporations within its jurisdiction, it may do so permanently; and it may, upon the same ground, relinquish

its police power, the right of eminent domain, and other sovereign powers, until nothing of the state government remains but a name. I should greatly regret the general recognition of such a doctrine, or even acquiescence in it without protest, as sound constitutional law; and therefore I feel constrained to withhold my assent to it at this ·time. I do not propose to enter upon any discussion of the question, however, as it is not necessarily the ground upon which our decision in this case is founded. I concede that the supreme court of the United States say that the question whether the legislature has power to grant away the right of taxation is one not open for discussion in that court, because this power has been affirmed by repeated adjudications made in that court, and the doctrine of the Dartmouth College case has been applied in all its extent and rigor to such a legislative grant. And where the legislature has made a grant exempting property from taxation, and there is no provision in the law itself, or in general statutes, or in the constitution, reserving the right to amend or repeal it, it is held to be a contract, and all the rules and principles which are applied to the pecuniary obligations of natural persons have been applied to such a grant. *Jefferson Branch Bank v. Skelly*, 1 Black, 436; *Home of the Friendless v. Rouse*, 8 Wallace, 430; *The Washington University v. Rouse,* id., 439; *Wilmington Railroad v. Reid*, 13 id., 264; *The Raleigh & Gaston Railroad v. Reid*, id., 269. But I cannot refrain from quoting some remarks of Mr. Justice MILLER, as contained in his dissenting opinion in the case of *The Washington University v. Rouse*, which seem to me to be a just criticism upon some of the decisions of that court in regard to the validity of contracts, while presenting in a most forcible manner some objections to the doctrine upon which those decisions rest. He says, speaking for the minority of the court:

" But we must be permitted to say, that in deciding the first of these propositions, namely, the validity of the contract, this court has, in our judgment, been, at times, quick to discover a

contract, that it might be protected, and slow to perceive that what are claimed to be contracts were not so, by reason of the want of authority in those who profess to bind others.  This has been specially apparent in regard to contracts made by legislatures of states, and by those municipal bodies to whom, in a limited measure, some part of the legislative function has been confided.   We do not believe that any legislative body, sitting under a state constitution of the usual character, has a right to sell, to give or to bargain away forever the taxing power of the state.   This is a power which in modern political societies is absolutely necessary to the continued existence of any such society.   W hile under such forms of government, the ancient chiefs or heads of the government might carry it on by revenues owned by them personally and by the exaction of personal service from their subjects, no civilized government has ever existed that did not depend upon taxation, in some form, for the continuance of that existence.   To hold, then, that any one of the annual legislatures can, by contract, deprive the state forever of the power of taxation, is to hold that they can destroy the government which they are appointed to serve, and that their action in that regard is strictly lawful."

" It cannot be maintained that this power to bargain away for an unlimited time the right of taxation, if it exists at all, is limited in reference to the subjects of taxation.   In all the discussions of this question, in this court and elsewhere, no such limitation has been claimed.   If the legislature can exempt, in perpetuity, one piece of land, it can exempt all land.   If it can exempt all land, it can exempt all other property.   It can as well exempt persons as corporations.   And no hindrance can be seen in the principle adopted by the court, to rich corporations, as railroads and express companies, or rich men, making contracts with the legislatures, as they best may, and with such appliances as it

is known they do use, for perpetual exemption from all the burdens of supporting the government." (Pp. 442 and 443).

It seems to me that these remarks of the learned judge present a much sounder view of the principles involved in this question of constitutional law, than the one adopted by the majority of the court. But however this may be, certainly under the paramount authority contained in the constitution, the right of the legislature to modify or repeal the law exempting the lands from taxation must be affirmed under the decisions of that court. In the case of *Home of the Friendless v. Rouse*, the legitimate and necessary inference to be drawn from the opinion of the court is, that the legislature might have *resumed* the power of taxation which it had relinquished, if it had reserved the right to do so in the grant itself to the corporation, or by making the general law upon the subject apply to it. But the court say that the legislature, in express terms, withdrew the charter granting the exemption, from the operation of the general statute which reserved the right to alter or repeal the grant. But the case most nearly in point, and which indeed it is impossible to distinguish from the one before us, is that of *Tomlinson v. Jessup*, 15 Wallace, 454. In that case, Jessup, of New York, an owner of a number of shares in the Northeastern Railroad Company, a corporation created in 1851 by the state of South Carolina, filed a bill against Tomlinson and other officers of the state of South Carolina, to enjoin them from levying a tax upon the property of the road. The act incorporating the company contained a grant of the usual powers of railroad companies, and the charter was for the term of fifty years. At this time there was in existence a general law, which provided that the charter of every corporation subsequently granted, and any renewal, amendment or modification thereof, should be subject to amendment, alteration or repeal, by legislative authority, unless the act granting the charter, or the

renewal, amendment or modification, in express terms excepted it from the operation of that law. In 1855 the charter of the company was amended by exempting from taxation, during the continuance of the charter, the stock of the company and other real estate it then owned or might thereafter acquire, connected with or subservient to the works authorized by its charter. There was no clause in the amendatory act excepting it from the provisions of the general law reserving to the legislature the right to amend, alter or repeal any charter granted or any modification or amendment thereof. The constitution of South Carolina adopted in 1868 made the property of corporations then existing subject to taxation except in certain cases; and by subsequent legislation this requirement of the constitution was carried out, and the property of the railroad company, its stock, etc., was taxed. And the sole question was, whether, under the circumstances, the property was liable to taxation. The court by a unanimous decision held that it was, and ordered the bill to be dismissed. Mr. Justice FIELD, in delivering the judgment of the court, makes use of the following emphatic language:

" It is true that the charter of the company, when accepted by the corporators, constituted a contract between them and the state, and that the amendment, when accepted, formed a part of the contract from that date, and was of the same obligatory character. And it may be equally true, as stated by counsel, that the exemption from taxation added greatly to the value of the stock of the company, and induced the plaintiff to purchase the shares held by him. But these considerations cannot be allowed any weight in determining the validity of the subsequent taxation. The power reserved to the state by the law of 1841 authorized any change in the contract as it originally existed or as subsequently modified, or its entire revocation. The original corporators, or subsequent stockholders, took their interests with knowledge of the existence of this power, and of the possibility of its exercise at any time in

the discretion of the legislature.  The object of the reserva
tion, and of similar reservations in other charters, is to prevent
a grant of corporate rights and privileges in a form which
will preclude legislative interference with their exercise if the
public interest should at any time require such interference.
It is a provision intended to preserve to the state control over
its contract with the corporators, which, without that provision,
would be irrepealable, and protected from any measure affect-
ing its obligation." (P. 458).

Now, unless we entirely misapprehend this decision and the
grounds upon which it proceeds, it is really decisive of the
case at bar.  In this case, as in that, exemption from taxation,
although constituting part of the contract between the state
and corporation, yet is, by the reservation of power in the
fundamental law over the subject, liable to be revoked like
any other provision of the charter, whenever in the judgment
of the legislature the public interests demand that the revoca-
tion should be made.  " The reservation affects the entire
relation between the state and corporation, and places under
legislative control all rights, priviliges and immunities derived
from its charter directly from the state."

The object and historical origin of the provision in the con-
stitution of this state are matters known to all professional
men.  They were, through this paramount authority, to retain
and secure to the state full power and control over corporate
franchises, rights and privileges which it might grant,— a pow-
er and control which the state was in a measure deprived of by
the federal constitution, as that instrument had been inter-
preted in the celebrated Dartmouth College case.  With the
grant of exemption from taxation was annexed the reservation
that such grant might be altered or revoked by the legislature
at any time after its passage.  It was a qualification of the grant,
and the subsequent exercise of the reserved power cannot
be regarded as an act impairing the obligation of contracts.

Precisely the same principle has been affirmed or distinctly

recognized by the supreme court in other cases where the question has arisen. *Sherman v. Smith*, 1 Black, 587; *Pennsylvania College Cases*, 13 Wallace, 190; *Miller v. The State*, 15 id., 478; *Holyoke Company v. Lyman*, id., 500; *Olcott v. The Supervisors*, 16 id., 678. It is deemed unnecessary to dwell upon these cases, or comment on them in detail. It is sufficient to state the result of them upon the question we are considering. And it is, where the power is reserved in the charter itself or in the general law, to alter, amend or withdraw the franchise or privilege granted, that this reservation qualifies the grant, and a subsequent exercise of the reserved power is not an act within the prohibition of the federal constitution as impairing the obligation of a contract.

But the counsel for the plaintiff company insist that the particular exercise of this reserved power in withdrawing the exemption was invalid, because it destroyed vested rights. The company proceeded to place in the market its bonds to raise money for the completion of its road, which said bonds were secured by a mortgage on said lands, and were sold to the amount of several millions of dollars, mainly by reason of the immunity of the land grant from taxation. Mr. Justice FIELD, in the extract already made, furnishes the answer to this argument. The original corporators, or subsequent stockholders, or bondholders, took their interests with knowledge of the existence of this reserved right on the part of the state of repealing the exemption acts, and of the possibility of its exercise at any time in the discretion of the legislature. A repeal of the act of incorporation would likewise affect the value of the bonds and of the security. But this consideration could have no weight in determining the question whether the legislature might not revoke or change its own grant of corporate rights. Suppose the provision exempting the lands from taxation for ten years, on condition that the company should complete its road within two years, had been included in its charter: would this render the charter any more sacred or inviolable, or place it beyond the

reach of the reserved power contained in the constitution ? It seems to us very plain that it would not. The whole charter would still be subject to revocation or alteration at the will of the legislature, and the fact that the rights of bondholders would be incidentally affected by the exercise of this power on the part of the legislature could make no difference. The matter would still be within the control of the legislature, although that result might follow from its act withdrawing the corporate grant. And the case is substantially in the same attitude now. The exemption is a corporate privilege, no more valuable, no more inviolable, than the charter itself. It may be conceded that the legislature, under the power of revocation, could not divest the company of its title to the land after it was earned, nor take away its property which it had acquired. The property of the corporation, for all moral purposes, stands upon the same ground as the property of an individual, and is equally protected by the constitution. Certain property held by charitable and religious societies is exempt from ordinary taxation in this state. Still this exemption might be revoked without interfering with the title or ownership of the property. It would throw upon this property additional burdens by removing the exemption, and render the use of the property less beneficial. We shall not attempt to define the limits within which this power of revocation must be exercised. This might be a difficult thing to do. It is sufficient for the purposes of this inquiry to say, that within the doctrine of *Tomlinson v. Jessup*, it might be exercised to repeal the acts exempting the lands in question from taxation. For the continuance of the exemption was a privilege granted to the company at the option of the legislature. It was not the same in nature and incidents as the property acquired and owned by the corporation. The legislature might resume the right of taxation which it had relinquished, within the power reserved to alter or repeal the franchises and privileges of corporations. The case of *State ex rel. Voight v. Hoeflinger*, 31 Wis., 257, is referred to by the

counsel for the company ; but we do not think it has any particular bearing upon the question under consideration, and therefore shall not dwell upon it.

But the right of the company to an exemption of the land from taxation is placed upon another ground. It is said these lands were granted by congress subject to the disposal of the legislature, to aid in the construction of the railroad mentioned in the act, and for no other purpose. It was therefore not competent for the state, after accepting the grant and attempting to execute the trust, to tax them. It is not claimed that there is anything in the act of congress prohibiting the state from taxing the lands, but that the exemption must be implied from those general principles of law regarding a trustee and his relations to the trust estate.

We are unable to adopt this view. It seems to us that when the lands were earned by the company they became its property, and, like the property of individuals, were subject to taxation. The state may, doubtless, relinquish its right to tax in particular cases, but it is well settled that an abandonment of this right is never presumed. As fast as the company acquired the title by the construction of the road, the trust was *pro tanto* executed. The right to tax existed as soon as the ownership of the lands was changed and they became private property. They then became liable to taxation and other burdens equally with the lands belonging to natural persons. Whether, if the state had at once granted the lands to the company, and the company, by a mortgage upon them, had raised money necessary to construct the road, the power of taxation could be exerted over the trust fund or not, is a question we need not consider. The case of *State ex rel. Douglas v. Hastings*, 11 Wis., 448, would have some relation to that question, but we do not perceive that it has any very direct application to the question we are considering. There is no complaint on the part of the United States that the lands are taxed and the trust estate diverted from the object of the grant. It is merely the

question whether the state can tax these lands, which have been acquired by the plaintiff company. And that question we think must be answered in the affirmative.

*By the Court.*— The judgment of the circuit court, dismissing the complaint, is affirmed.