STATE OF MINNESOTA ex rel. O. H. AROSIN and Another v. JOSEPH
EHRMANTRAUT and Another.[1]

December 3, 1895.

Nos. 9631—(104).

**City of St. Paul—Charter—Definition—Sp. Laws 1891, c. 6, § 1.**
     The word "charter," as used in Sp. Laws 1891, c. 6, § 1, may be defined
"as the enabling acts under which a municipal corporation exercises its priv-
ileges and powers and performs its duties and obligations, including all
matters in which the municipality has a direct interest, and the right to
regulate and control." These acts must necessarily include all laws relating
to the material affairs and direct interests of the municipality.

**Same—Courthouse and City Hall Committee.**
     *Held,* that under the provisions of chapter 6, § 1, supra, the president of the
assembly of the city of St. Paul is empowered annually to appoint the three
members of the common council of said city authorized upon such appoint-
ment to sit as members of that body known as the "Courthouse and City
Hall Committee," a body created by the terms of Sp. Laws 1889, c. 64.

Quo warranto on the relation of O. H. Arosin and Edward H.
Milham against Joseph Ehrmantraut and Robert N. Hare. Re-
spondents filed an answer, to which relators demurred on the ground
that the facts stated did not constitute a defense. Judgment of
ouster.

*H. W. Childs,* Attorney General, and *Walter L. Chapin,* for re-
lators.

*John H. Ives,* for respondents.

COLLINS, J.     It was determined in State v. Johnstone, 61 Minn.
562, 63 N. W. 176, that such portion of the charter of the city of
St. Paul as created the office and provided for the election annually
of a president of the city council was repealed by implication on the
passage of the amendatory act (Sp. Laws 1891, c. 6), and that by
this amendment the office was abolished.     In view of that decision,
the respondents herein are not entitled to sit as members of the body

1 Reported in 65 N. W. 251.

created and provided for by Sp. Laws 1889, c. 64, an act amendatory of Sp. Laws, 1881, c. 376, known as the "Courthouse and City Hall Committee," by virtue of appointments made in 1895 by a so-called president of the council.

In his brief, counsel for respondents calls special attention to the allegations in the answer, which he says must now be taken as true, that there is and has been a president of the common council since the year 1891. If, as we have held, that office was abolished by statute in 1891, there could not have been, and there is not, any such officer known to the law. The office, once abolished, cannot be again created by allegations in an answer; nor can an incumbent of such an office be brought into existence and established therein on paper. The allegations of the answer in respect to the existence of a president of the common council cannot be taken as true in the sense and to the extent claimed and contended for by counsel.

2. This brings us to a consideration of the real question in the case,—the right of the state to oust the respondents from their seats as members of the body known as the "Courthouse and City Hall Committee," and the right of the relators to take the seats thus vacated, and become members of that body.

Section 6 of the act of 1881, creating the courthouse and city hall committee, as amended by Sp. Laws 1889, c. 64, provided that upon the completion of the proposed building a committee of seven should have charge of it; that the mayor of the city ex officio should be a member of and chairman of the committee; that three members should be appointed annually from the members of the board of county commissioners by the chairman of the board, and three members should be appointed annually from the members of the city council by the president of said council.

At this time, and until the 1891 amendment to the charter, there was a president of the single body known as the "Common Council." It appears that commencing in 1891, and ending with the year 1894, the president of that body known as the "Assembly," acting under the provisions of Sp. Laws 1891, c. 6, latter part of section 1 (no question being raised as to the legality of the appointments), had annually appointed three members of the city council as members of the committee. Mr. Johnson, a member of the assembly, and the respondents, who were then and still remain aldermen, were ap-

pointed by the president of the assembly in June, 1894. In June, 1895, John Copeland was duly elected president of the assembly, and at the proper time he appointed, as members of the committee, Assemblyman Johnson, already a member, and the relator Arosin, an assemblyman, and the relator Milham, an alderman. Mr. Robb, a member of the assembly, had previously been elected by the assembly and the board of aldermen, in joint session, to preside over their joint sessions, and it is Mr. Robb whom the answer alleges was elected and is the president of the common council. About the same time that Mr. Copeland made his appointments, Mr. Robb, as president of the council, also made appointments, to which we have referred, naming Assemblyman Johnson and these two respondents. The chairman of the committee refused to recognize President Copeland's appointment of the relators, but did recognize the respondents as entitled to seats as members.

We have already stated that Mr. Robb had no authority to appoint, so that the case turns upon the right of President Copeland to appoint. If the latter was the proper officer to name the three members of the committee, the respondents must be ousted and the relators seated. If, upon the other hand, no authority has been conferred upon the president of the assembly to perform the duty which devolved upon the president of the council prior to 1891, it is a case of casus omissus, and no appointments can be made. This result of the legislation of 1891 would be extremely unfortunate, and much to be deplored, for while it may be that the respondents would hold over, by virtue of their appointment in 1894, until their successors were duly appointed, there would, in the nature of things, come a time when vacancies would occur without a possibility of their being filled.

Here we wish to say, by way of explanation of the suggestion that the respondents might hold over, that the right of the respondents to sit as members of the committee under appointments made in June, 1894, by the president of the assembly, was questioned in an action duly brought by the attorney general, in the name of the state, in the district court for Ramsey county in November, 1894. That proceeding was duly tried upon its merits, and judgment duly rendered, establishing the respondents' right and title to their positions as members of the committee for the year ending in June, 1895.

That judgment, not having been appealed from or reversed, is binding upon the state in this proceeding, and at this time no question can be raised as to the rights of the respondents under the appointments made in 1894.

Unquestionably, the question in the present proceeding depends upon the construction to be placed upon the language used in the legislation of 1891 (chapter 6, § 1),—the latter part of which reads: "And in such cases as the charter of said city now provides that the president of the common council ex officio * * * shall perform certain duties outside of legislative duties, such duties and powers are granted to and imposed upon the president * * * of said assembly,"—and especially upon what is meant by the word "charter." If this word is to be construed with great technicality and strictness, it may be doubtful whether the president of the assembly was thereby empowered to name three members of the council as members of the committee. But if we are to construe it so as to give full effect to the language used in the quoted sentence, as well as to the intention of the lawmakers,—what they had in mind, what powers and duties they referred to when transferring to the president of the assembly such powers and duties, except legislative, which had theretofore devolved upon the president of the common council,—the question is not difficult of solution.

That prior to 1895 there was no misunderstanding as to the legislative intent, and as to what was meant by the use of the word "charter" in the paragraph, in the minds of those persons most interested, is clearly evidenced by the fact that for three years successively, commencing in 1891, the president of the assembly annually made the appointments, and the right of his appointees to seats as members of the committee stood unquestioned and without challenge. One of the definitions of the word "charter" given in Webster is "an act of a legislative body creating a municipal or other corporation and defining its powers and privileges." Of course, the charter provisions need not be comprised in a single act, and in addition to defining the corporate powers and privileges, the methods of exercising such powers and privileges, the details of the manner in which all corporate functions are to be performed may be and usually are specified. Parts of the charter may be found in independent legislative acts, the charter not being named in their titles. If independ-

ent acts relate to the rights, powers, duties, and obligations of the city, they are to be regarded as parts of the city charter. Morton v. Power, 33 Minn. 521, 24 N. W. 194.

In addition to the legislative act under consideration in that case,[2] we might specify a large number of instances where independent acts, in the titles of which no reference is made to the charter of the city of St. Paul, would, beyond all doubt, be held parts of that charter. And so it is with nearly every city in the state holding its charter by virtue of special legislation. So that by judicial construction the definition of the word "charter," when applied to municipal corporations, has been enlarged and broadened until it may be defined thus: "As the enabling acts under which a municipal corporation exercises its privileges and powers and performs its duties and obligations, including all matters in which the municipality had a direct interest, and the right to regulate or control." These acts must necessarily include all laws relating to the material affairs and direct interests of the municipality.

Now, by the terms of Sp. Laws 1881, c. 376, and the amendatory acts, the county of Ramsey and the city of St. Paul were authorized and empowered to jointly erect upon county property a courthouse and city hall combined. The county was required to deed an undivided half of the premises to the city, which was done. The cost of constructing the building was to be borne equally by these tenants in common. When completed, the structure was to be jointly occupied for county and city purposes. The entire premises were to be cared for jointly, and the expense of maintenance equally divided. Equal representation, as near as possible, upon the committee was provided for, and the salaries of the members of the board were to be paid in equal shares by the county and city. The interests of these two parties are equal and identical, and because of the equality of interest each should be represented alike, and each have the same voice in the management of the joint property. Public interests require that, if possible, neither county nor city should be without the representation in the committee designed and provided for by the act creating it. To be sure, the body called the "committee" is an independent body, and not a part of the city government, but its function is to take care of property owned and occupied by the county and city jointly; and, while the body itself is no part of the city gov-

[2] Sp. Laws 1881, c. 188.

ernment, the appointment of the representatives of the city in the body is the exercise of a strictly municipal power of the city.

If it should be held that, because of the abolishment of the office of president of the common council, the power to appoint representatives from the council has lapsed, and no one can appoint, the time will come when the three members of the board of county commissioners and the mayor, who is ex officio chairman of that board, and designates his associates on the committee from the members thereof, will have entire and supreme control. The city will have no voice in the matter, except as it may be represented by the mayor, and, as before stated, he represents the county also. We think that, while it could not be held that said chapter 376 and its amendments are parts of the city charter, we are amply justified in construing the word "charter," as used in Sp. Laws 1891, c. 6, § 1, as referring to and meaning all enactments which relate to and bear upon matters in which the city has a direct interest, and that we are holding strictly within the legislative intent and purpose when we say that the design was to confer upon the president of the assembly the power to appoint representatives of the city to such places and upon such boards as the direct property interests of the city might require, in all cases where the power had previously been conferred upon the president of the common council.

The definition of the word "charter," when used in reference to municipal corporations, as we have heretofore given it, is broad enough to warrant this construction. There would be no doubt about our construction of the word if the power to make these appointments had been given in a separate act,—an act independent of all complications. That the power was not given by direct and exclusive legislation, but was conferred in a law which not only created the committee or agency, but provided for the appointment of other members from the county board, and, further, that the representatives of the city were to act upon an independent board, cannot be allowed to control.

In conclusion it may be advisable to say that, on this branch of the case, there is no similarity between it and State v. Johnstone, supra. The office there in question was that of county assessor. Such assessor was not a city officer, nor did he represent the city in any manner. The city had no direct interest in the duties which he was to

perform, nor did it pay him for his services. The distinction between the cases in this respect is obvious.

The respondents are not entitled to sit as members of the body known as the "Courthouse and City Hall Committee." The relators are. Let a writ of ouster issue against the respondents.