MILWAUKEE ELECTRIC RAILWAY & LIGHT COMPANY, Appellant, vs. RAILROAD COMMISSION OF WISCONSIN, Respondent.

*April 29—May 31, 1913.*

*Public utilities: Street railways: Regulating rates of fare: Legislative power: Delegation to municipalities: Statutes and ordinances construed: Constitutional law: Impairing obligation of contracts: Reserved power to amend franchises: Taking of property without compensation.*

1. Authority given by a revised statute (sec. 1862, Stats.) to a municipal corporation to grant to a street railway corporation the use of streets "upon such terms" as the proper authorities shall determine, does not differ from the authority, given by such statute in its original form, to make such grant "upon such terms *and conditions*" as the common council might impose.

2. A municipal ordinance providing that the rate of fare upon a street railway "shall be not to exceed five cents" did not make a fixed rate, as distinguished from a limitation upon the rate,

and was not in that respect substantially different from a prior ordinance providing that the rate of fare "shall not exceed five cents."

3. The power to fix rates and tolls to be charged by public utilities is one of the attributes of sovereignty, and with us is vested in the legislature.

4. No presumption can be indulged that the legislature has parted with such power, nor will doubtful words be construed as having that effect.

[5. Whether the legislature could by express language authorize municipal authorities to make contracts with public utilities fixing rates which should exist for definite periods in the future and be beyond legislative control during those periods, is not determined.]

6. Sec. 1862, Stats.—which provides that any municipal corporation may grant to a street railway company the use, "upon such terms as the proper authorities shall determine," of streets, bridges and parkways for the purpose of laying tracks and running cars thereon, to be propelled by animals or such other power as shall be agreed on, and that every such road shall be constructed upon the most approved plan and be subject to such reasonable rules and regulations and the payment of such license fees as the municipal authorities may from time to time prescribe,—does not empower municipal authorities to make any contract with a street railway company fixing rates of fare so that they may not be changed by the legislature or through a legislative agency (such as the Railroad Commission) in the manner provided by law.

[7. Whether municipal ordinances relating to rates of fare upon a street railway and claimed to be in the nature of contracts are subject to alteration or repeal under sec. 1, art. XI, Const., not determined.]

MARSHALL and VINJE, JJ., dissent.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

This is an appeal from a judgment dismissing the plaintiff's complaint, after a demurrer thereto had been sustained and the plaintiff had declined to plead over within the time granted by the court. The action is an action brought under the provisions of sec. 1797m—64, Stats., to vacate and set aside, as unlawful and unreasonable, an order of the defendant *Commission* purporting to fix certain rates at which

street-car tickets should be sold in packages by the plaintiff over its lines in Milwaukee; which rates were somewhat less than the rates fixed by certain ordinances of the city previously passed.   The essential facts are fairly stated in the appellant's brief, substantially as follows:

The complaint shows that the *Milwaukee Electric Railway & Light Company* is incorporated, among other purposes, for the conduct of a street railway, and that it operates a street railway extending throughout the city of Milwaukee over a large number of streets.

The company's present street railway system involves a consolidation of five previous systems.   Three of these originally were constructed as horse railways and by authority of the common council changed to electric railways.   The fourth originally was planned as a cable railway, but afterwards was authorized to be constructed as an electric railway; and the fifth was constructed as a steam motor or "dummy" road, but subsequently, by due authority, was changed to an electric line.

The plaintiff's street railway is operated under franchises which may be divided into three classes: (1) franchises granted to individuals in 1874, and passing by mesne conveyances to the plaintiff; (2) franchises granted to other street railway corporations and also passing by mesne conveyances to the plaintiff; and (3) a franchise embodied in an ordinance and resolution enacted by the city January 2, 1900, extending all existing franchises, which will be referred to as the "1900 ordinance."

Of the franchises granted to individuals, some were granted to Frank B. Van Valkenburg *et al.* and some to John H. Tesch *et al.*   All were granted during the year 1874, and were to extend for a term of fifty years from the time of the grant.   Under them the street railway was constructed and is now actually being operated on some of the most important

streets forming the key to the street railway situation in the city of Milwaukee.

The franchises granted to other corporations were embodied in ordinances and resolutions of the city of Milwaukee and cover a number of other streets over which the plaintiff operates.

The so-called "1900 ordinance" was passed January 2, ·1900, and granted to the plaintiff the right to operate over certain portions of streets for which it theretofore·had no franchises. It provided also that all franchises expiring prior to December 31, 1934, should be extended from the date of such previous expiration to December 31, 1934, and all franchises which otherwise would expire subsequently to December 31, 1934, were made to terminate on that date. The franchise entailed on the company the obligation to give a universal transfer and also to furnish power to swing drawbridges, make certain expenditures for strengthening bridges, and transport on its cars free of charge certain policemen, firemen, and health officers, and contained the following provisions as to rates of fare:

"Sec. 6. After the passage, publication and acceptance of this ordinance by said railway company, the rate of fare for one continuous passage upon the lines of railway within said city limits of said city owned and operated by said railway company constructed under any franchise herein, heretofore or hereafter granted to said railway company or its predecessors, successors or assigns, as the case may be, shall be not to exceed five cents for a single fare, except for children under ten years of age the rate of fare shall be three cents for one child and five cents for two children, and infants under three years of age free. Except where cars or carriages shall be chartered at a special price, which fare shall entitle each passenger, upon demand made at the time of payment of fare, to one transfer at established points of transfer to any connecting or cross line of said railway company for passage within said city, and convenient points of transfer shall be

maintained and such additional points of transfer established as will carry out the full intent and purpose of this ordinance to maintain and extend the transfer system now in force upon the lines of said railway company at the present standard of convenience for the people of said city. Each transfer ticket shall be good only for the passenger to whom it is issued, and for a continuous trip in the direction specified upon the transfer so given, and upon the first car leaving the transfer intersection after the time designated on such transfer.

"Provided, however, that after the acceptance of the terms of this ordinance the railway company shall, on demand made at its office in said city, or to the conductors on its cars operated on its lines within the corporate limits of said city, sell tickets in packages of twenty-five for one dollar or six for twenty-five cents, each of which tickets shall entitle the holder thereof to use the same upon the cars of said railway company only between the hours of 5:30 o'clock and 8 o'clock in the morning and between the hours of 5 o'clock and 7 o'clock, central standard time, in the afternoon of each day until January 1, 1905, and shall also entitle the holder to the same privileges as are or may be accorded to passengers paying a cash fare of five cents; and the said railway company shall, from and after January 1, 1905, continue the sale of tickets in packages at the price aforesaid until December 31, 1934, each to be good at all hours of the day, with same privileges as are or may be accorded to passengers paying a single cash fare of five cents."

Of the various ordinances granting franchises, one, that of March 26, 1866, granted to the Milwaukee City Railway Company, one of the plaintiff's predecessors, provided that the rate of fare should not exceed six cents, including the government tax.

All other franchises, including those granted to Van Valkenburg et al. and Tesch et al., included a provision that the rate of fare "shall not exceed five cents" except for chartered cars, etc.

The various street railway companies were all acquired by the Milwaukee Street Railway Company, and on foreclosure

of its mortgage passed to the plaintiff in January, 1896. From that time on all these companies were operated by the plaintiff, and the complaint alleges that prior to 1900 the plaintiff was entitled to charge and did charge a cash fare of five cents to each passenger and was not obliged to furnish any transfers whatever.

The plaintiff or its predecessors accepted the various franchises granted to them respectively and fulfilled the terms thereof, and in compliance with the terms of the 1900 ordinance the plaintiff, instead of charging merely a cash fare of five cents as it theretofore had done, sold tickets at the rates prescribed in the ordinance and granted universal transfer privileges.

In November, 1906, the city of Milwaukee filed a complaint with the defendant *Railroad Commission* for a reduction of the rates of fare and filed a second similar complaint on May 13, 1908. In proceedings held on these complaints the *Railroad Commission,* on August 23, 1912, entered the order involved in this case. This order did not interfere with the cash fare, but provided that the company should discontinue its ticket rate of twenty-five for one dollar (the rate prescribed by the 1900 ordinance) and should sell tickets in packages of thirteen for fifty cents, which tickets were ordered to be accepted in payment of fare.

Thereupon the plaintiff instituted this action to vacate and set aside this order and enjoin the execution, performance, and enforcement thereof, and also prayed for a temporary injunction.

For the appellant there was a brief by *Miller, Mack & Fairchild,* attorneys; a separate brief signed by *Sullivan & Cromwell, William J. Curtis,* and *Henry H. Pierce,* of counsel; and oral argument by *Mr. Curtis, Mr. Geo. P. Miller, Mr. Edwin C. Mack,* and *Mr. Pierce.* They contended, *inter alia:*

I. The city ordinances created contracts with reference to

the rate of fare which are property, and are protected by the provisions of the constitutions of the United States and of this state prohibiting the impairment of contracts and the taking of property without compensation. *Walla Walla v. Walla Walla W. Co.* 172 U. S. 1, 9, 19 Sup. Ct. 77; *City R. Co. v. Citizens' R. Co.* 166 U. S. 557, 563, 564, 567, 568, 17 Sup. Ct. 653; *Detroit v. Detroit Citizens' St. R. Co.* 184 U. S. 368, 382, 383, 389, 396–398, 22 Sup. Ct. 410; *Cleveland v. Cleveland City R. Co.* 194 U. S. 517, 533–536, 24 Sup. Ct. 756; *Cleveland v. Cleveland E. R. Co.* 201 U. S. 529, 541, 26 Sup. Ct. 513; *Minneapolis v. Minneapolis St. R. Co.* 215 U. S. 417, 436, 437, 30 Sup. Ct. 118; *Home T. & T. Co. v. Los Angeles,* 211 U. S. 265, 29 Sup. Ct. 50; *Linden L. Co. v. Milwaukee E. R. & L. Co.* 107 Wis. 493, 83 N. W. 851.

II. The *Commission's* order violates the franchises providing for the rate of fare. (a) The provision that the railways might charge a cash fare of "not to exceed five cents" gave the railways a contract right to charge a five-cent fare. *Detroit v. Detroit Citizens' St. R. Co.* 184 U. S. 368, 22 Sup. Ct. 410; *Minneapolis v. Minneapolis St. R. Co.* 215 U. S. 417, 30 Sup. Ct. 118. (b) The *Commission's* order affects only the price of tickets and that is fixed by the "1900 franchise" beyond question.

III. The legislature had no power against the will of the company to change the terms of the franchises fixing the rate of fare. Sec. 1, art. XI, Const., plainly has reference only to the *formation* of corporations. The grant of a franchise under sec. 1862, Stats., is not a right that comes to a corporation as part of its formation, but it is a separate *subsequent* grant made by the municipality. It is not a corporate power or privilege even under sub. 7 of sec. 31, art. IV. *Linden L. Co. v. Milwaukee E. R. & L. Co.* 107 Wis. 493, 83 N. W. 851. The distinction is clear between franchises which attach to a corporation as part of its incorporation or

corporate charter and other franchises or governmental privi-
leges. The latter, like any other property owned by a cor-
poration, are not subject to a reserve power attached to the
incorporation or formation of the company. *Calumet S. Co.
v. Chilton,* 148 Wis. 334, 370, 135 N. W. 131; *In re South-
ern Wis. P. Co.* 140 Wis. 245, 122 N. W. 801; *People v.
O'Brien,* 111 N. Y. 1, 44, 46–52, 18 N. E. 692, 700, 703;
*Skaneateles W. W. Co. v. Skaneateles,* 161 N. Y. 154, 55 N.
E. 562; *Memphis & L. R. R. Co. v. Railroad Comm'rs,* 112 U.
S. 609, 619, 5 Sup. Ct. 599; *Louisville v. Cumberland T. &
T. Co.* 224 U. S. 649, 661, 32 Sup. Ct. 572; *Omaha W. Co.
v. Omaha,* 147 Fed. 1; *Denver v. New York T. Co.* 187 Fed.
890; *Los Angeles v. Los Angeles C. W. Co.* 177 U. S. 558,
573, 20 Sup. Ct. 736.

For the respondent there were briefs and oral argument by
the *Attorney General* and *Walter Drew,* deputy attorney gen-
eral; by *Lester C. Manson,* special counsel; and by *Daniel W.
Hoan,* city attorney of Milwaukee, and *Max Schoetz, Jr.,* of
counsel. They argued, among other things:

I. The power to regulate in the public interest the tolls or
rates of charge of one engaged in a public service is a police
power inherent in the sovereignty of the state. *Att'y Gen.
v. Railroad Cos.* 35 Wis. 425, 589, 590; *Madison, W. & M.
P. Co. v. Reynolds,* 3 Wis. 287; *Whiting v. S. & F. du L. R.
Co.* 25 Wis. 167; *Munn v. Illinois,* 94 U. S. 113; *Granger
Cases,* 94 U. S. 155, 164, 179–181; *Wabash, St. L. & P. R.
Co. v. Illinois,* 118 U. S. 557, 7 Sup. Ct. 4; *Ruggles v. Illi-
nois,* 108 U. S. 526, 531, 2 Sup. Ct. 832; *Railroad Commis-
sion Cases,* 116 U. S. 307, 325, 6 Sup. Ct. 334, 348, 349,
388, 391, 1191; *Chicago & G. T. R. Co. v. Wellman,* 143 U.
S. 339, 344, 12 Sup. Ct. 400; *Reagan v. Farmers' L. & T.
Co.* 154 U. S. 362, 14 Sup. Ct. 1047; *Smyth v. Ames,* 169
U. S. 466, 526; *Cotting v. Kansas City S. Y. Co.* 183 U. S.
79, 84, 85, 22 Sup. Ct. 30; *Louisville & N. R. Co. v. Ken-
tucky,* 183 U. S. 503, 515, 517, 22 Sup. Ct. 95; *Home T. &

*T. Co. v. Los Angeles,* 211 U. S. 265, 271, 273, 29 Sup. Ct. 50; *State ex rel. Wis. T. Co. v. Sheboygan,* 111 Wis. 23, 38, 86 N. W. 657; *Madison v. Madison G. & E. Co.* 129 Wis. 249, 264, 108 N. W. 65; *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 157, 159, 160, 116 N. W. 905; *State ex rel. Kenosha G. & E. Co. v. Kenosha E. R. Co.* 145 Wis. 337, 346, 129 N. W. 600; *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 426, 130 N. W. 530; *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 19, 20, 129 N. W. 925; *Chicago, B. & Q. R. Co. v. Railroad Comm.* 152 Wis. 654, 140 N. W. 296. There is no exception in favor of a street railway. *State ex rel. Att'y Gen. v. Madison St. R. Co.* 72 Wis. 612, 620, 40 N. W. 487; *Hobart v. Milwaukee City R. Co.* 27 Wis. 194, 199, 200; *Fayetteville St. R. Co. v. A. & R. R. Co.* 142 N. C. 423, 55 S. E. 345, 9 Am. & Eng. Ann. Cas. 683; *Comm. v. I. C. St. R. Co.* 187 Mass. 436, 73 N. E. 530, 2 Am. & Eng. Ann. Cas. 419.

II. This sovereign power of regulation is one which belongs exclusively to and can be exercised only by the legislature. *Madison v. Madison G. & E. Co.* 129 Wis. 249, 267, 108 N. W. 65; *Express Cases,* 117 U. S. 1, 29, 6 Sup. Ct. 542, 628, 1190; *Interstate Comm. Comm. v. C., N. O. & T. P. R. Co.* 167 U. S. 479, 505, 17 Sup. Ct. 896. There is no departure from this principle of law, which makes the exercise of the state power of regulation exclusively a legislative function, in ch. 362, Laws of 1905, authorizing the *Railroad Commission* to ascertain and declare the lawful rate. *Chicago & N. W. R. Co. v. Dey,* 35 Fed. 866, 874, 875; *Reagan v. Farmers' L. & T. Co.* 154 U. S. 362, 393, 394, 14 Sup. Ct. 1047; *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 161, 163, 164, 116 N. W. 905; *State ex rel. Kenosha G. & E. Co. v. Kenosha E. R. Co.* 145 Wis. 337, 346–348, 129 N. W. 600.

III. The city of Milwaukee was not authorized to abrogate by ordinance or contract the sovereign power of the state to

regulate appellant's rates. It had no general power as a municipality to make a contract in its business or proprietary capacity fixing appellant's rates of fare. It had no general power, by delegation from the legislature in the exercise of state agency authority, to regulate appellant's fares and so confer the rights claimed by appellant by surrender of such power. Sec. 1862, Stats., expressly empowered the city to grant appellant only *the use of its streets* "upon such terms as the proper authorities shall determine." In granting such a privilege of street user the municipality acts as agent of the state. It is a franchise grant by the state acting through the municipality. *State ex rel. Att'y Gen. v. Madison St. R. Co.* 72 Wis. 612, 619, 620, 40 N. W. 487; *Wright v. Milwaukee E. R. & L. Co.* 95 Wis. 29, 36, 69 N. W. 791; *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 27, 129 N. W. 925. The act of a municipal council in passing a franchise ordinance conferring upon a street railway company the right of street user is legislative in character, and such ordinances only cover, and could only cover, such rights as the common council had power to grant. *Lange v. La Crosse & E. R. Co.* 118 Wis. 558, 562, 95 N. W. 952; *State ex rel. Kenosha G. & E. Co. v. Kenosha E. R. Co.* 145 Wis. 337, 129 N. W. 600. Such grants must be strictly construed in the interests of the public and of the preservation of the powers of government. *Ruggles v. Illinois,* 108 U. S. 526, 2 Sup. Ct. 832; *Railroad Commission Cases,* 116 U. S. 307, 6 Sup. Ct. 334, 348, 349, 388, 391, 1191; *Home T. & T. Co. v. Los Angeles,* 211 U. S. 265, 29 Sup. Ct. 50; *Georgia R. & B. Co. v. Smith,* 128 U. S. 174, 9 Sup. Ct. 47; *Stone v. Farmers' L. & T. Co.* 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191; *Freeport W. Co. v. Freeport,* 180 U. S. 587, 21 Sup. Ct. 493; *Danville W. Co. v. Danville,* 180 U. S. 619, 21 Sup. Ct. 505; *Rogers Park W. Co. v. Fergus,* 180 U. S. 624, 21 Sup. Ct. 490; *Northern Pac. R. Co. v. Minnesota,* 208 U. S. 583, 28 Sup. Ct. 341; *Knoxville W. Co. v. Knoxville,* 189 U. S. 434, 23 Sup. Ct. 531. The

power of the city to impose "terms" cannot be construed to enlarge the power conferred upon the city so as to include the different and distinct power to grant to appellant the additional privilege of charging unreasonable and unlawful rates or to grant it immunity from governmental control and *thus make the city's grant with terms greater than an unconditional grant without terms.* Immunity from governmental control of the rates of a public service company can only be by positive and express grant of the legislature.

IV. The provisions of the franchise ordinance relating to rates of fare are mere limitations upon the company's right to charge, and do not confer on the company an irrevocable grant or binding contract right to charge the rates of fare named.

V. The legislature has power to regulate appellant's rates of fare as a valid exercise of the power reserved to it under sec. 1, art. XI, Const. *Madison, W. & M. P. Co. v. Reynolds,* 3 Wis. 287, 296; *Pratt v. Brown,* 3 Wis. 603, 611, 615, 616; *Nazro v. Merchants' Mut. Ins. Co.* 14 Wis. 295, 299, 300; *Kenosha, R. & R. I. R. Co. v. Marsh,* 17 Wis. 13, 17; *Whiting v. S. & F. du L. R. Co.* 25 Wis. 167, 198; *Pick v. Rubicon H. Co.* 27 Wis. 433, 440; *State v. Milwaukee G. L. Co.* 29 Wis. 454, 461; *Chapin v. Crusen,* 31 Wis. 209, 215; *West Wis. R. Co. v. Trempealeau Co.* 35 Wis. 257, 270, 271; *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, 569–574, 576, 579; *State ex rel. Cream City R. Co. v. Hilbert,* 72 Wis. 184, 192, 194, 195; *Ashland v. Wheeler,* 88 Wis. 607, 616, 60 N. W. 818; *State v. Railway Cos.* 128 Wis. 449, 505, 108 N. W. 594; *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 28, 29, 129 N. W. 925; *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 415, 417, 130 N. W. 530; *Tomlinson v. Jessup,* 15 Wall. 454; *Sinking Fund Cases,* 99 U. S. 700, 730; *Close v. Glenwood Cemetery,* 107 U. S. 466, 477, 2 Sup. Ct. 267; *Shields v. Ohio,* 95 U. S. 319, 324; *Spring*

*Valley W. W. Co. v. Schottler,* 110 U. S. 347, 353, 356, 4 Sup. Ct. 48; *Hamilton G. L. & C. Co. v. Hamilton,* 146 U. S. 258, 270, 13 Sup. Ct. 90; *Northern Cent. R. Co. v. Maryland,* 187 U. S. 258, 268, 269, 23 Sup. Ct. 62; *Stanislaus Co. v. San Joaquin & K. R. C. & I. Co.* 192 U. S. 201, 211–213, 24 Sup. Ct. 241; *Fair Haven & W. R. Co. v. New Haven,* 203 U. S. 379, 388–390, 27 Sup. Ct. 74; *Calder v. Michigan,* 218 U. S. 591, 600, 31 Sup. Ct. 122; *Matthews v. Corporation Comm'rs,* 97 Fed. 400, 404.

VI. The regulation of appellant's rates of fare is not a taking of its property within the inhibitory provisions of state or federal constitutions or within the recognized limitation upon the reserved power. The exercise of such inherent authority or power reserved is an act strictly *in accordance with the contract* and not an impairment of it, or a taking of property.

Winslow, C. J. We are much indebted to counsel for the illuminating briefs and able oral arguments with which we have been favored by both sides in this case. It is but just to say that our labors have been much lightened thereby.

The case, however, is not in itself complicated or difficult of statement. There is in fact but a single question, and that is whether the ordinances referred to in the statement of facts, so far as they specify the rates of fare which may be charged, constitute contracts which are protected by the state and federal constitutions from impairment.

On the part of the appellant the familiar principle is relied on that where municipal authorities, acting under clear and unmistakable legislative authority so to do, have granted the use of streets to a public utility corporation for the purpose of serving the people, and the grant has been accepted by the utility and performance entered upon, a contract has been created between the public and the corporation, which cannot

be impaired by subsequent legislation. *Walla Walla v. Walla Walla W. Co.* 172 U. S. 1, 19 Sup. Ct. 77; *Wright v. Milwaukee E. R. & L. Co.* 95 Wis. 29, 69 N. W. 791. We do not understand that it is seriously questioned by the respondent in the present case that so far as the use of the streets is concerned the grants contained in the ordinances before us became contracts which, when accepted and acted upon, could not be subsequently impaired by legislation. The primary contention of the respondent is, however, that so far as the rates of fare are concerned the legislature has not given to municipal authorities the power to hamper future legislative action in any way, and that the ordinances in question, when fairly construed, do not attempt to do so.

This contention involves primarily careful consideration and construction of the language of the statute under which the city acted in passing the ordinances in question.

The statute in question now appears as sec. 1862, Stats. 1911, and provides that any municipal corporation or county may grant to a street railway corporation, or to any person who has the right to construct, maintain, and operate street railways, "upon such terms as the proper authorities shall determine," the use of streets, bridges, and parkways for the purpose of laying tracks for street railway purposes, the cars to be propelled by animals or such other power as may be agreed upon. The section further provides that every such road shall be constructed on the most approved plan and be subject to "such reasonable rules and regulations and the payment of such license fees" as the municipal authorities may from time to time prescribe. This section first appeared in substance upon the statute books of the state as ch. 313 of the Laws of 1860. So far as the questions involved in this case are concerned there has been no substantial change in the language or legal effect of the statute since its enactment in 1860. In the original act the grant of the use of the streets

was authorized to be made "upon such terms and *conditions*" as the common council might impose. In the revision of 1878, however, the act of 1860 was condensed into one section (sec. 1862), and in the process of condensation the word "conditions" was dropped out as surplusage, which it plainly was.

The various ordinances, prior to the ordinance of 1900, provided that the rate of fare "shall not exceed five cents," except for chartered cars, etc. The ordinance of 1900 changed this language somewhat and provided that the rate of fare "shall be not to exceed five cents for a single fare, except for children under ten years of age the rate of fare shall be three cents for one child and five cents for two children, and infants under three years of age free." The last named ordinance also made elaborate provision for transfers and provided that the company "shall" sell tickets in packages of twenty-five for one dollar, etc., as will more fully appear by examination of sec. 6 of the ordinance, which is printed in full in the statement of facts. Some contention is made by the appellant to the effect that the difference in language between the earlier ordinances, which provide that the fare "shall not exceed five cents," and the ordinance of 1900, which provides that the fare "shall be not to exceed five cents," is indicative of a purpose in 1900 to make a fixed rate instead of placing a limitation upon the rate, but we do not regard the change in language as of any substantial significance. The two phrases seem to us as indicating the same essential purpose.

In construing the meaning of the statute in question, certain fundamental considerations must be kept clearly in mind if we would reach correct and just conclusions, and some of the more important of these considerations will first be stated.

The power to fix rates and tolls to be charged by public

utilities is one of the attributes of sovereignty.    With us this great power is vested in the legislature, and when the legislature speaks upon the subject its voice is controlling and supreme, unless indeed some constitutional guaranty is invaded. *Madison v. Madison G. & E. Co.* 129 Wis. 249, 108 N. W. 65.    A century ago this great power was of little practical importance, and very seldom used.    The public utility as we know it had not yet come.    Life was comparatively simple, individual wants few, and individual resources generally sufficient to provide for them.    The ordinary citizen knew little about gas and less about electricity, which he regarded as nothing more than a supernatural and remorseless destroying force.    He drove his own horse, if fortunate enough to own one, drank water from his own well, had no telephone, sent no telegrams, used no railroad, sent no express packages, and was dependent upon no public utility, either for the necessities or the luxuries of life.    No such life is possible today, however. The progress of science and invention, combined with the tremendous growth of congested urban areas, has made the great mass of the people absolutely dependent upon the great public utilities of the time.    Modern business and modern life could not go on without them.    The urban citizen of to-day goes to his business upon the street railway and transacts it with the aid of the telegraph, the telephone, the express company, and the commercial railway.    The gas and electric companies light his home, cook his meals, furnish him power for domestic operations, and sometimes even furnish him heat; while water companies provide him with water and telephone companies afford him opportunity at any moment for conversation with friends either at home or in distant cities.

We must catalogue our public utilities and try to imagine how we would get along without them if we would realize our dependence upon them.    Only by so doing can we appreciate the supreme importance of the rate-making power and

the necessity of keeping that power intact in the hands of the legislature.  If it be not so kept the opportunities for abuse are numerous.  Clearly the legislature should not part with the power, even for a limited time, except upon the most potent and convincing considerations.

No presumption can be indulged that it has parted with the power, nor will doubtful words be construed as having that effect.  He who asserts that the state has surrendered any part of its sovereign power even temporarily in his favor must prove the fact by the most convincing evidence.  The presumptions, if any there be, must run the other way.  If it were to be admitted for the purposes of the argument that the legislature could by express language authorize municipal authorities to make contracts with public utilities fixing rates which should exist for definite periods in the future and be beyond legislative control during those periods (a proposition concerning which we intimate no opinion), the question here is whether such express language is to be found in sec. 1862.

The section does not contain the word "contract," nor any words of similar import, except that the provision relating to the motive power provides that the cars shall be propelled by animals, or "such other power as shall be agreed on."  The word "grant" is, of course, a contract word, but the grant simply covers the right to the use of the streets; nothing else is specifically authorized to be "granted."  This grant is to be upon "terms."  Not such terms as may be agreed on (as in the case of the motive power), but such terms as the municipal authorities "shall determine."  Here clearly is language appropriate to the exercise of power by the municipal authorities, rather than to the making of a contract; to the imposition of commands by a superior power rather than to the reaching of a result by negotiation and agreement between equals.

Assuming that under this language a city might make a contract with a public utility, fixing rates or tolls for a definite period, which would bind the city itself and prevent any change of rates by the city authorities during the contract period, the question still remains whether the section can be construed as giving the city authorities any power to bargain away the sovereign right of the state to regulate fares and tolls and lower them, if found to be excessive.

If this question were a new one in this state we should entertain no doubt that it should be answered in the negative, but we do not regard it as new.

In the case of *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925, the question of the proper construction of sec. 1863, Stats., with regard to the extension of street railways into adjoining towns and through other cities, so as to constitute interurban lines, was before the court. In that case the city of Manitowoc had by ordinance, passed in November, 1902, fixed the fare to be charged between the cities of Manitowoc and Two Rivers at ten cents, and the ordinance had been accepted by the interurban company, the track laid, and the line operated until May 1, 1909, when the company raised the fare to fifteen cents, and the city brought its action in equity to compel the interurban company to abide by its contract and carry all passengers at the contract rate. It was strenuously urged in that case that the ordinance and acceptance formed a contract between the state and the company, which could not be impaired by the legislature itself, while it was contended on the other side that the Railroad Commission Act had already amended and superseded the ordinance. This contention brought the question of the power of the legislature squarely into the case, and made it not only proper but really necessary to determine whether by the passage and acceptance of the ordinance the power of the state to regulate fares had been suspended. Upon these contentions it was held that while the ordinance and its acceptance

31] JANUARY TERM, 1913. 609

Milwaukee E. R. & L. Co. v. Railroad Commission, 153 Wis. 592.

constituted a contract which bound the interurban company to carry passengers at the ten-cent rate in the absence of legislative action, still the power of the legislature to regulate rates had not been in any way impaired by the action of the city and the company. In this connection this court then said:

"No specific authority having been conferred on the city to enter into the contract in question, the right of the state to interfere whenever the public weal demanded was not abrogated. The contract remained valid between the parties to it until such time as the state saw fit to exercise its paramount authority, and no longer. To this extent, and to this extent only, is the contract before us a valid subsisting obligation. It would be unreasonable to hold that by enacting sec. 1862, Stats. (1898), or sec. 1863, Stats. (Supp. 1906: Laws of 1901, ch. 425), the state intended to surrender its governmental power of fixing rates. That power was only suspended until such time as the state saw fit to act."

If it be said that sec. 1863 was in question in that case instead of sec. 1862, and hence that the language cannot be considered as decisive, the answer is that so far as the question here presented is concerned the provisions of the two sections are practically identical. Sec. 1862 authorizes the municipal authorities to "grant" the use of streets "upon such terms" as they shall determine, and sec. 1863 authorizes "consent" to the use of streets "upon such terms" and subject to such rules and regulations and the "payment of such license fees as the council or board may from time to time prescribe." We are of opinion, therefore, that the holding in the *Manitowoc Case,* to the effect that neither section indicated any legislative intention of surrendering the sovereign power of the state to regulate fares, was entirely correct and was advisedly made.

The appellant places great reliance upon the cases of *Detroit v. Detroit Citizens' St. R. Co.* 184 U. S. 368, 22 Sup. Ct. 410; *Cleveland v. Cleveland City R. Co.* 194 U. S. 517,

610    SUPREME COURT OF WISCONSIN.    [MAY

Milwaukee E. R. & L. Co. v. Railroad Commission, 153 Wis. 592.

24 Sup. Ct. 756; and *Minneapolis v. Minneapolis St. R. Co.*
215 U. S. 417, 30 Sup. Ct. 118. In none of these cases, how-
ever, was the question here presented before the court. Those
cases were all actions between the city and a street railway
company operating under a city ordinance, passed under leg-
islative authority, fixing the rates of fare to be charged, which
ordinance had been accepted by the company, and in each of
them the city had endeavored to lower the rates of fare by
subsequently enacted ordinances. In each case it was held
that the ordinance and its acceptance constituted a contract
between the city and the company which was binding on both
parties during its term, and hence that the subsequent ordi-
nance attempting to lower the contract rate of fare was an
attempt to impair the obligations of a contract, and void.
This was practically the decision of this court in the *Mani-
towoc Case,* and these cases were there cited. In no way,
however, do they affect the question whether the *legislature of
the state* has lost its sovereign power to fix reasonable rates.

The case here is much more similar in principle to the
case of *Georgia R. & B. Co. v. Smith,* 128 U. S. 174, 9 Sup.
Ct. 47, where the legislature in 1833 had chartered a rail-
road, and authorized it to charge tolls and rates of fare "not
exceeding" certain specified sums. It was argued on behalf
of the railroad company that by this clause the railroad was
exempted from legislative interference with its rates within
the designated limits for all time. This contention was how-
ever rejected, and it was said that "to effect this result the
exemption must appear by such clear and unmistakable lan-
guage that it cannot be reasonably construed consistently with
the reservation of the power [*i. e.* the power to regulate rates]
by the state."

It is unnecessary to consider other questions which were
much discussed by counsel in the present case. If under sec.
1862 no power was given to municipal authorities to hamper

or impair the sovereign right of the state to regulate fares, then the ordinances in question cannot, of course, affect that power, whatever may be their terms. So far as the state is concerned the ordinance constitutes no obstacle to the exercise of its power to regulate rates.

We reach this conclusion the more readily because this state has adopted an eminently just and wise policy in dealing with the matter of rates and tolls. By the Railroad Commission legislation it has laid down the general rule that every rate must be reasonable, and has left it to a commission of experts to determine, after full investigation, the reasonable rate, and apply it. It is believed that this board passes on these questions with judicial fairness after the most careful and searching investigation of the conditions, and with a single eye to the attainment of a fair result. So long as these provisions of law remain in force and are allowed to control the situation, all danger of immature, hasty, or vindictive changes in rates is practically eliminated. On the one hand, the citizen is protected from unreasonable and excessive fares; on the other, the capitalist and investor is assured a reasonable and fair return upon his investment. No door is open for any serious injustice.

The view which is here taken of the meaning and effect of the provisions of sec. 1862 renders unnecessary any consideration of the question whether the ordinances in question are subject to alteration or repeal under sec. 1 of art. XI of the constitution, which authorizes the enactment of general laws for the formation of corporations without banking powers, and forbids the creation of corporations by special act except in certain instances, and reserves the right to alter or repeal at any time all such general laws or special acts.

The proposition decided in this case is that sec. 1862, Stats., does not empower municipal authorities to make any contract with a street railway company fixing rates of fare so

that they may not be changed by the legislature, or through a legislative agency in the manner provided by law.

*By the Court.*—Judgment affirmed.

TIMLIN, J. (*concurring*). Acting upon complaint of the city of Milwaukee the *Railroad Commission* of this state, in the exercise of power conferred upon it by secs. 1797—1 to 1797—38, Stats., on August 23, 1912, made an order requiring the appellant to discontinue its ticket rate of twenty-five tickets for one dollar, and to sell, through its conductors, tickets in packages of thirteen for fifty cents, each ticket to entitle the bearer to one continuous passage in the same general direction with privilege of one transfer between the single-fare points, upon the city lines of the appellant.

Before their compilation into what is now known as the Wisconsin Statutes, the acts of the legislature above referred to and the powers of the *Railroad Commission* thereunder were considered by this court in *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 116 N. W. 905. It was there held that these statutes, declaring that railroad rates and services shall be reasonable and creating a commission with power to investigate existing rates and services and to fix and determine what rates and services are reasonable and providing that the rates and services so fixed shall be in force, are valid acts of legislation, and that conclusion is not questioned in the instant case, but is here mentioned as descriptive of the proceedings in which the order of the *Railroad Commission* is made. Under these statutes the appellant brought an action in the circuit court for Dane county against the *Railroad Commission* to review the said order of the latter, averring said order to be unlawful and unreasonable because the order and any law authorizing the same is a law impairing the obligation of contracts, depriving the plaintiff of property without due process of law, and in vio-

lation of the constitution of the United States and of that of
the state of Wisconsin.   The *Railroad Commission* inter-
posed a general demurrer to the complaint.   This demurrer
was sustained, and the appellant elected to stand upon said
complaint and refused to amend, whereupon judgment was
entered dismissing the complaint, thereby affirming the order
of the *Railroad Commission*.   No case is made for relief on
the ground that the order in question is confiscatory in that
it deprives the appellant of a fair return upon its property
invested, and the arguments in this court are not directed to
that point.   The only point made is that the order of the
*Railroad Commission* and the statutes under which it is made
are invalid as impairing the obligation of a contract.   In
order to bring the case within that paramount rule of law,
the appellant avers its corporate character and shows the
magnitude of its property and operations, that it operates
under and by virtue of a certain ordinance or resolution duly
enacted by the mayor and common council of the city of Mil-
waukee on January 2, 1900, which contained, among other
things, the following:

"Sec. 6. After the passage, publication and acceptance of
this ordinance by said railway company, the rate of fare for
one continuous passage upon the lines of railway within said
city limits of said city owned and operated by said railway
company constructed under any franchise herein, heretofore
or hereafter granted to said railway company or its predeces-
sors, successors or assigns, as the case may be, shall be not to
exceed five cents for a single fare, except for children under
ten years of age the rate of fare shall be three cents for one
child and five cents for two children, and infants under three
years of age free.   Except where cars or carriages shall be
chartered at a special price, which fare shall entitle each pas-
senger, upon demand made at the time of payment of fare,
to one transfer at established points of transfer to any con-
necting or cross line of said railway company, for passage
within said city, and convenient points of transfer shall be

614     SUPREME COURT OF WISCONSIN.     [May

Milwaukee E. R. & L. Co. v. Railroad Commission, 153 Wis. 592.

maintained and such additional points of transfer established as will carry out the full intent and purpose of this ordinance to maintain and extend the transfer system now in force upon the lines of said railway company at the present standard of convenience for the people of said city. Each transfer ticket shall be good only for the passenger to whom it is issued, and for a continuous trip in the direction specified upon the transfer so given, and upon the first car leaving the transfer intersection after the time designated on such transfer.

"Provided, however, that after the acceptance of the terms of this ordinance the railway company shall, on demand made at its office in said city, or to the conductors on its cars operated on its lines within the corporate limits of said city, sell tickets in packages of twenty-five for one dollar or six for twenty-five cents, each of which tickets shall entitle the holder thereof to use the same upon the cars of said railway company only between the hours of 5 :30 o'clock and 8 o'clock in the morning and between the hours of 5 o'clock and 7 o'clock, central standard time, in the afternoon of each day until January 1, 1905, and shall also entitle the holder to the same privileges as are or may be accorded to passengers paying a cash fare of five cents; and the said railway company shall, from and after January 1, 1905, continue the sale of tickets in packages at the price aforesaid until December 31, 1934, each to be good at all hours of the day, with same privileges as are or may be accorded to passengers paying a single cash fare of five cents."

The rights and privileges granted by this ordinance and all other ordinances therein mentioned and hereinafter referred to were made to expire on December 31, 1934. The ordinance provided for acceptance in writing by the appellant, and the appellant did so accept.

In addition to the usual consideration implied by such acceptance and undertaking of the duties imposed and the disbursement of money in construction, the appellant set forth that prior to and at the time of the enactment of said ordinance of January 2, 1900, it had succeeded, on the reorganization of a corporation called the Milwaukee Street Rail-

way Company, to all the property, franchises, rights, powers, and privileges of the latter.  Among these were several separate and distinct franchises, rights, powers, and privileges granted by the legislature of Wisconsin through the agency of the city and in the form of ordinances and resolutions adopted by the mayor and common council of Milwaukee, making grants to several separate and distinct corporations, to each of which the Milwaukee Street Railway Company succeeded by mesne conveyances from each of the separate corporations owning such franchises.  Each of these franchises or grants covered the use of streets in distinct parts of the city and authorized the grantee to charge a five- or six-cent cash fare, provided for no commutation rates and no transfer privileges to the other lines.  The appellant and each of the aforementioned corporations (except one incorporated by special act March 28, 1865) were stock corporations organized under the general incorporation laws of this state, and the term "mesne conveyances" as here used includes all modes of transfer.

While in possession of and operating said properties under the several franchise ordinances mentioned, the franchise ordinance of January 2, 1900, was enacted and accepted by the appellant.  In accepting said last mentioned ordinance it is averred that the appellant surrendered to the city valuable rights under the prior existing ordinances and made certain concessions, substantially as follows: Appellant by such acceptance agreed that all said franchise ordinances should expire December 31, 1934; agreed to sell commutation tickets at the reduced rates mentioned; agreed to furnish the city electric power to swing drawbridges and to make improvements in streets prior to repaving thereof, to transport on its cars free of charge members of the police, fire, and health departments of said city when in uniform, also detectives of the police department, and to maintain transfer points and give

616    SUPREME COURT OF WISCONSIN.    [May

Milwaukee E. R. & L. Co. v. Railroad Commission, 153 Wis. 592.

transfers on its lines of railway, to strengthen and rebuild bridges over which its tracks might extend at its own expense, and to extend its tracks to the city limits when required; and that it has performed upon its part.    The ordinance of January 2, 1900, which is made part of the complaint, imposes these and other obligations.    By sec. 3 of that ordinance all rights reserved or secured to the city by and under all ordinances in force or by the laws of Wisconsin relating to regulating the speed and headway of cars, etc., and everything connected with the exercise of the rights thereby or theretofore granted to said railway company and its predecessors, are reserved to the city the same as though that ordinance had not been passed.    By sec. 7 all rights, privileges, grants, and franchises theretofore granted by said city to said railway company and the several corporations or parties from or through whom it has acquired the same are confirmed and granted to the appellant, its successors and assigns, except as modified or changed by the ordinance of January 2, 1900.

It is noticeable that all the incorporations except the earliest, viz. that of March 28, 1865, of John Plankinton and associates, were under the general incorporation laws of this state, and all the franchise ordinances authorizing the construction and operation of the street railways in the streets of the city of Milwaukee were enacted by the mayor and common council in the exercise of the power delegated to that body by sec. 1862, Stats., which first appears as ch. 313, Laws of 1860, then became sec. 1862, R. S. 1878, amended by ch. 219, Laws of 1881, then became sec. 1862, Stats. (1898), and preserves that number in the present compilation called the Wisconsin Statutes.    The act of 1860 authorized any municipal corporation to grant such use as it should deem proper of any street or streets within the limits of such corporation to any street railway company organized under general or special act of the legislature of this state or to any individual,

etc.; . . . "such grant to be made by the common council of any such municipal corporation, upon such terms and conditions as they may impose, and with such privileges as may be necessary, reasonably, to secure the objects of the grant." This act was carried into the revision of 1878 as sec. 1862 and the language condensed and changed somewhat. "Such use as it shall deem proper" became "the use," and "upon such terms and conditions as they may impose" became "upon such terms as the proper authorities shall determine." But there was manifestly no intention to make any material change in the law. *State ex rel. Bergenthal v. Bergenthal,* 72 Wis. 314, 39 N. W. 566.

It has long been the law of this state that grants of corporate powers or privileges are strictly construed and nothing will be held to pass by implication. *Janesville B. Co. v. Stoughton,* 1 Pin. 667. And even in the case of natural persons something equivalent to an express contract seems to have been thought necessary. *Chapin v. Crusen,* 31 Wis. 209. Where an act of the legislature or a city ordinance is claimed to create an irrepealable contract it will be strictly construed in favor of the state or city. *State ex rel. Cream City R. Co. v. Hilbert,* 72 Wis. 184, 39 N. W. 326. This is also the rule of the United States supreme court. *Detroit Citizens' St. R. Co. v. Detroit R. Co.* 171 U. S. 48, 18 Sup. Ct. 732.

By art. 2 of the articles of compact contained in the Northwest Ordinance enacted prior to the constitution of the United States, by sec. 10 of art. I of the constitution of the United States, and by sec. 12 of art. I of the constitution of this state, laws impairing the obligation of contracts are prohibited. If a contract when made was valid by the constitution and laws of the state as then expounded by the highest state authorities, no subsequent action by the state legislature or judiciary can impair its obligation. *Chicago v. Sheldon,* 9 Wall. 50. A state cannot by amendment of its constitution or by the

618     SUPREME COURT OF WISCONSIN.     [MAY

Milwaukee E. R. & L. Co. v. Railroad Commission, 153 Wis. 592.

adoption of a new constitution impair the obligation of an existing contract. *Gunn v. Berry,* 15 Wall. 610; *Fisk v. Jefferson Police Jury,* 116 U. S. 131, 6 Sup. Ct. 329; *Shreveport v. Cole,* 129 U. S. 36, 9 Sup. Ct. 210. The interdict is not, however, unlimited. The provision in question does not protect contracts made in breach of a public trust. *Ill. Cent. R. Co. v. Illinois,* 146 U. S. 387, 13 Sup. Ct. 110. Nor contracts void as against public policy of the United States. *Taylor v. Thomas,* 22 Wall. 479. Nor an incomplete contract. *Garrison v. New York,* 21 Wall. 196. Nor does it operate to limit the police power of the state so as to prevent legislation in the interest of public health, morals, or safety. *Stone v. Mississippi,* 101 U. S. 814; *Chicago, B. & Q. R. Co. v. Nebraska,* 170 U. S. 57, 18 Sup. Ct. 513; *Beer Co. v. Massachusetts,* 97 U. S. 25; *Fertilizing Co. v. Hyde,* 97 U. S. 659. Nor a contract made under delegated authority so far as it exceeds the delegated power. *Water, L. & G. Co. v. Hutchinson,* 207 U. S. 385, 28 Sup. Ct. 185; *Home T. & T. Co. v. Los Angeles,* 211 U. S. 265, 29 Sup. Ct. 50; *Milhau v. Sharp,* 27 N. Y. 611, 84 Am. Dec. 314; *Lake Roland E. R. Co. v. Baltimore,* 77 Md. 352, 26 Atl. 510, 20 L. R. A. 126; *East St. Louis v. East St. Louis G. L. & C. Co.* 98 Ill. 415, 448. Nor a gratuity founded upon no good or valuable consideration. *Tucker v. Ferguson,* 22 Wall. 527; *West Wis. R. Co. v. Trempealeau Co.* 93 U. S. 595; *Salt Co. v. East Saginaw,* 13 Wall. 373.

If this clause of the federal constitution were limited to executory contracts, the questions arising thereunder would not be so serious and far-reaching, for these executory contracts must in a comparatively short time be either performed or breached and so pass out of existence, satisfied by performance or existing as a right of action for damages or specific performance, closed by recovery or barred by statutes of limitations. But it was early decided that after performance there

remains an implied contract that neither party to the original contract shall retake, but that each shall enjoy the rights transferred in the execution of the contract. *Fletcher v. Peck,* 6 Cranch, 87; *Terrett v. Taylor,* 9 Cranch, 43; *Dartmouth College v. Woodward,* 4 Wheat. 518; *Green v. Biddle,* 8 Wheat. 1; *Hamilton v. Brown,* 161 U. S. 256, 16 Sup.. Ct. 585. Within this rule and subject to the foregoing limitations, charters to corporations other than municipal are, with reference to all contractual features thereof, considered grants and not to be impaired by subsequent legislation. *State Bank v. Knoop,* 16 How. 369; *Pearsall v. G. N. R. Co.* 161 U. S. 646, 16 Sup. Ct. 705; *People ex rel. Schurz v. Cook,* 148 U. S. 397, 13 Sup. Ct. 645.

"As applied to corporations, every grant of franchises is a charter. It may be a grant of the mere franchise of being a corporation or a grant of powers to a corporation already in existence. In either case the grant is the company's charter to exercise the rights and privileges and enjoy the immunities granted. Bouvier defines the word 'charter' to be a grant made by the sovereign either to the whole people or to a portion of them, securing to them the enjoyment of certain rights. Bouvier's Law Dic. 'CHARTER.' 'All franchises,' says Chief Baron COMYN, 'are derived from the king and ought to be claimed by charter.' Com. Dig. 'FRANCHISES,' A 71. 'Besides the charter of incorporation, a body politic has granted to it other charters, by which the crown, from time to time, adds to or modifies the powers,' etc. Grant, Corp. 13." *State v. Comm'r of R. R. Taxation,* 37 N. J. Law, 228, 237.

Without express definition this rule is made one of the bases of decision in *Tomlinson v. Jessup,* 15 Wall. 454.

"The charter of a corporation formed under a general law consists of its articles of association and the law under which it is organized." *Bent v. Underdown,* 156 Ind. 516, 60 N. E. 307; *O'Brien v. Cummings,* 13 Mo. App. 197; *State ex rel. Ross v. Anderson,* 31 Ind. App. 34, 67 N. E. 207; *State ex rel. Arosin v. Ehrmantraut,* 63 Minn. 104, 65 N. W. 251.

This is supported by many decisions of the supreme court of the United States and of this court, in which distinct and separate statutes, enacted long after the corporation was organized and in existence, are treated as part of the charter and within or without the rule of *Dartmouth College v. Woodward,* 4 Wheat. 518, as the case might be; or within or without the reserved power to repeal or alter corporate charters as the case might be. Among such cases are *State v. Railway Cos.* 128 Wis. 449, 108 N. W. 594; *Water Power Cases,* 148 Wis. 124, 134 N. W. 330; *State ex rel. Cream City R. Co. v. Hilbert,* 72 Wis. 184, 39 N. W. 326; *West Wis. R. Co. v. Trempealeau Co.* 35 Wis. 257.

Grants by the state to a corporation of property, tangible or intangible, not in the nature of franchises, made upon a consideration moving from the corporation, are easily within the rule of the foregoing cases whether such grants be part of the corporate charter or not. Corporations are on a par with natural persons in this respect. As to all statutes which form part of the corporate charter and which confer status, create obligations, or grant or impose powers or duties which the state is powerless to confer, create, grant, or impose without the consent of the natural persons affected, there is also a contract consummated by such consent. This also includes charter provisions indispensable to the maintenance of the status, the performance of the obligation, or the exercise of the powers. But as regards other provisions found in a charter imposing obligations or conferring powers which the state might impose or confer upon any person or class without the consent of the latter, there is no element of contract.

In the instant case two questions are presented: (1) Was a contract in form fixing the rates of fare to be charged during the life of the franchise ordinance of 1900 entered into by and between the city and the appellant? Was a power delegated by the state to the city to make a contract which would

for the life of the franchise prevent the state from exercising
its power to fix other and reasonable rates? This last cannot
be justly or fully ascertained or determined without consider-
ing (a) what power the state had, and (b) what power did it
intend to delegate. Because of the rule of law that reasonable
doubts must be resolved in favor of the constitutionality of an
act of the legislature we cannot correctly answer (b) without
considering (a). The provision of the ordinance of 1900 that
the rate of fare shall be not to exceed five cents is neither
more nor less than a provision that the rate of fare shall not
exceed five cents. Attempted distinction reduces itself to .
hypercriticism. Standing alone, this provision would be the
mere fixing of a maximum above which the fare could not be
raised by the corporation, within the rule of *Georgia R. & B.
Co. v. Smith,* 128 U. S. 174, 9 Sup. Ct. 47; *Rogers Park W.
Co. v. Fergus,* 180 U. S. 624, 21 Sup. Ct. 490, and cases
cited. The *Railroad Commission* did not disturb this five-
cent fare. But this provision does not stand alone, and is not
in question on this appeal except for the purpose of aiding in
the construction of that part of the franchise ordinance in-
volved which asserts that "after the acceptance of the terms
of this ordinance the railway company shall on demand made
at its office in said city or to the conductors on its cars . . .
sell tickets in packages of twenty-five for one dollar . . .
each of which shall entitle the holder thereof to the same priv-
ileges as are or may be accorded to passengers paying a cash
fare of five cents; and . . . shall continue the sale of tickets
in packages at the price aforesaid until December 31, 1934."
Privileges to which a cash fare entitles the payer are not only
transportation and the care and accommodations due a pas-
senger, but also "one transfer at established points of trans-
fer to any connecting or cross line of said railway company
for passage within said city." This last, as appears by the
complaint, was a matter of compromise and agreement be-

tween the city and the street railway company, the latter sur-
rendering a right or at least a *bona fide* claim to charge, ac-
cording to existing franchises, a five-cent fare on each of its
several lines without transfers, and accepting this substitute
and making the concession above quoted.   In construing this
ordinance for the purpose of ascertaining whether or not it
constitutes a contract in the particular mentioned, we must
assume for that purpose that the city had authority to con-
tract.   In other words, to get the true meaning we must first
read the ordinance just as if it were a transaction between two
natural persons or between two corporations having power to
make such a contract.   Whether or not the city had such
power is another question.   But assuming, for the purpose of
ascertaining the true meaning of the writing, capacity to con-
tract, I think there was a contract with reference to the sale
of tickets in packages of twenty-five within the rule of *Cleve-
land v. Cleveland City R. Co.* 194 U. S. 517, 24 Sup. Ct.
756; *Cleveland v. Cleveland E. R. Co.* 201 U. S. 529, 26
Sup. Ct. 513; *Detroit v. Detroit Citizens' St. R. Co.* 184 U.
S. 368, 22 Sup. Ct. 410.   All the identities of a contract ex-
isted: parties, stipulations in writing, consisting of the ordi-
nance and written acceptance, a surrender of the privileges
claimed or held by the railway company, and an assumption
of a new definite obligation to be continued for a fixed period,
and a provision that the former ordinances should be in force
except as modified by these new stipulations.   The city pro-
posed by the ordinance that the railway company shall sur-
render its claim to charge a five-cent fare under each of its
several existing ordinances on each of its lines and shall dur-
ing the ensuing thirty-four years sell tickets in packages of
twenty-five at the rate named and give transfer privileges to
the holder of such tickets, and the railway company, by its
written acceptance required in the ordinance, relinquishes its
former right or claim and agrees to sell tickets at the specified

rates during the period mentioned. This, as regards that part of the ordinance in question, and aside from questions of its legality, is in form and substance a contract. Strict construction must nevertheless be fair and honest construction, and its chief office is in resolving ambiguities and cannot afford a justification for distorting the true meaning.

The constitution of this state contains the following:

Sec. 1, art. XI: "Corporations without banking powers or privileges may be formed under general laws, but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws. All general laws or special acts enacted under the provisions of this section may be altered or repealed by the legislature at any time after their passage."

Art. 8 of sec. 1 of the North Carolina constitution of 1875 and art. 8 of sec. 1 of the New York constitution of 1894 are literal transcripts of the section of the Wisconsin constitution above quoted, and California (1880), Michigan (1850), Maryland (1891), Maine (1875), Washington (1889), Arkansas (1874), and other states have substantially similar constitutional provisions. Long before the enactment of ch. 313, Laws of 1860, and but six years after the adoption of our state constitution, the case of *Madison, W. & M. P. Co. v. Reynolds,* 3 Wis. 287, and the case of *Pratt v. Brown,* 3 Wis. 603, came before this court, and the scope and effect of sec. 1 of art. XI, *supra,* was discussed and declared. Again in 1861, in the case of *Nazro v. Merchants' Mut. Ins. Co.* 14 Wis. 295, this section was under consideration. It was in effect declared that all rights and franchises of a corporation are received, held, and exercised solely upon the faith of the sovereign grantor and during its pleasure. In 1870 the case of *Whiting v. S. & F. du L. R. Co.* 25 Wis. 167, came before this court, and the question of reducing or regulating rates or tolls was discussed and decided, and the power to so regulate

was considered to exist under the quoted section of our consti-
tution (pp. 198 *et seq.*). In 1874 the case of *West Wis.
R. Co. v. Trempealeau Co.* 35 Wis. 257, affirmed 93 U. S.
595, was decided, and there, following *Tomlinson v. Jessup,*
15 Wall. 454, and quoting therefrom, this court said: "The
reservation affects the entire relation between the state and
corporation, and places under legislative control all rights,
privileges, and immunities derived from its charter directly
from the state."

In *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, statutes regu-
lating rates of carriage by railways were upheld under the
quoted section of our constitution. Both the last mentioned
cases are referred to and followed in *Manitowoc v. Manito-
woc & N. T. Co.* 145 Wis. 13, 129 N. W. 925. The latter
case is in all essential respects like the instant case, and is
authority for the proposition that where a corporation is or-
ganized under the general laws of this state and thereafter
receives by ordinance from a municipality a grant of the right
to use a highway for the purpose of operating its railway
thereon, and this grant specifies the rate of fare to be charged,
the state may later, acting through the *Railroad Commission,*
establish a reasonable rate different from and higher than the
rate specified in the franchise ordinance. This, as I under-
stand it, is exactly in line with *Stanislaus Co. v. San Joaquin
& K. R. I. & C. Co.* 192 U. S. 201, 24 Sup. Ct. 241. Con-
sidering a similar situation somewhat stronger in favor of the
corporation, the United States supreme court there said:

"The authority given by the act of 1862 enabled the board
of supervisors to conditionally regulate the rates. There is
no promise made in the act that the legislature would not it-
self subsequently alter that authority. The state simply au-
thorized its agents, the boards of supervisors, to regulate rates,
but not to reduce them below a certain point. We do not
think that from this language a contract can or ought to be
implied that the state might not thereafter authorize the

boards to reduce them, or that it might not itself do so directly."

Passing to the consideration of the reserved power as declared in the California constitution of 1849, which like our constitution spoke of the "formation" of corporations in these words: "Corporations may be formed under general laws, but shall not be created by special act except for municipal purposes. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed," it was held, following *Tomlinson v. Jessup,* 15 Wall. 454, that the object was "to prevent a grant of corporate rights and privileges in a form which will preclude legislative interference with their exercise if the public interest should at any time require such interference. . . . The reservation affects the entire relation between the state and the corporation, and places under legislative control all rights, privileges, and immunities derived by its charter directly from the state."

The franchise ordinance granted by the board of supervisors under delegated authority from the state was therefore considered a part of the corporate charter and as such subject to repeal or alteration. Agencies are created and contracts are made and construed with reference to existing laws. It is not to be presumed that the legislature, by the enactment of sec. 1862, Stats., intended to abrogate or suspend for a time its power of regulation or confer upon the municipal councils authority greater than that possessed by the legislature itself. Under the so-called reserved power in the constitution the legislature could not, in the conferring of corporate franchises or privileges, enact an irrepealable law. The state did not intend, therefore, that the municipality granting the use of the streets to a corporation organized under general laws should have power to do that which the legislature itself could not do. The cases of *City R. Co. v. Citizens' St. R. Co.* 166 U. S. 557, 17 Sup. Ct. 653; *Detroit v. Detroit Citizens' St.*

*R. Co.* 184 U. S. 368, 22 Sup. Ct. 410; *Cleveland v. Cleveland City R. Co.* 194 U. S. 517, 24 Sup. Ct. 756; *Cleveland v. Cleveland E. R. Co.* 201 U. S. 529, 26 Sup. Ct. 513; and *Minneapolis v. Minneapolis St. R. Co.* 215 U. S. 417, 30 Sup. Ct. 118, have been brought to our attention, but they are not in point. As indicated in *Detroit v. Detroit Citizens' St. R. Co., supra,* at page 397, these were contests between the city and the carrier, and the state had not undertaken to assert its rights under the reserved power nor delegated to the city the authority to exercise the power of alteration or repeal. This power is by the constitution not reserved to the city, but to the state through its legislature. The laws in existence when and where a contract is made necessarily enter into and form part of the contract. *McCracken v. Hayward,* 2 How. (43 U. S.) 608; *State ex rel. Damman v. Comm'rs,* 4 Wis. 414; *Von Baumbach v. Bade,* 9 Wis. 559. The rates of common carriers, whether natural persons or corporations, were, when all these ordinances were enacted and accepted, subject to reasonable regulation by the state. That rule of law, as well as the existing and declared constitutional law of this state, must be read into the delegation of power contained in sec. 1862 and into each and every grant of the use of the streets made by the municipality pursuant to that section. Counsel contend for a narrow and technical construction of sec. 1, art. XI, Const.; in substance that the power to alter or repeal relates only to the right or franchise to exist as a corporation and does not include alteration or repeal of grants of power made by the state directly or through its delegate to an existing corporation. But this is contrary to nearly all the decided cases. This notion seems to have arisen from a curious perversion of what was decided in *Att'y Gen. v. Railroad Cos.* 35 Wis. 425. In that case it was argued by counsel for the railroad companies that ch. 273, Laws of 1874, classifying the roads and fixing rates, was a special act and therefore obnoxious to sub. 7 of sec. 31 of art. IV of our state

constitution, then lately adopted as an amendment. This provided that the legislature is prohibited from enacting any special or private law for granting corporate powers or privileges except to cities, while sec. 32 of the same article declared that the legislature shall provide general laws for the transaction of any business that may be prohibited by sec. 31 of this article, and all such laws shall be uniform in their operation throughout the state. This was a point of some difficulty because the statutes there in question had many of the earmarks of a special law, and because many corporate charters granted by special law were outstanding and in force and their provisions were various, and if the legislature could not alter one without altering all, or repeal one without repealing all, great confusion and injustice might result. To meet this argument the court said (p. 559):

"It was contended that this amendment, prohibiting the grant of corporate powers by special act, operates as a repeal of the reserved power of altering existing special charters by special acts; that the prohibition to grant corporate powers includes, not only the creation of new corporations, but also the grant of new powers to existing corporations and by inference the limitation or regulation of existing corporate powers, by special acts; and so confines the reserved power to alter special charters, to general laws.

"The difficulty of altering special charters by general laws, which shall be uniform throughout the state, is very apparent. And if this were the true construction of the amendment, it would almost follow that special charters could no longer be repealed by special acts, and that the whole reserved power was relegated to general laws. It was even said by counsel that the charter of a corporation, organized under general law, could be repealed only by repeal of the general law; so that one corporation of one kind could not be subjected to repeal without repealing the charters of all corporations of the same kind under the same general law. This is almost an argument *ad absurdum*. . . .

"We shall not stop to dwell here on the importance of the reserved power. . . . We shall only assume here that it is a

power of great significance and gravity; of such moment, that it is impossible to believe that the legislature and the people intended to surrender or impair it; very hard to believe that they suffered themselves to surrender or impair it by implication, in an amendment designed for quite a different purpose, quite consistent with the reserved power.

"But the purpose of the amendment, so far as it affects sec. 1, art. XI, appears to us very manifest. It was designed to act on the first clause only of the section, taking away the legislative discretion and changing the directory provision into a prohibitory one; and not to touch the second clause of the section at all, leaving the reserved power where it found it, to be exercised thereafter as theretofore, upon special charters, by special acts. . . .

"We can see nothing in the letter or spirit of the amendment to warrant us in giving it a construction to impair the reserved power. . . . And we feel bound to hold, and find no difficulty in holding, the phrase in the amendment, to grant corporate powers or privileges, to mean *in principio donationis,* and equivalent to the phrase, to grant corporate charters. This is implied not only by the word grant, but also by the word corporate. A franchise is not essentially corporate; and it is not the grant of franchise which is prohibited, but of corporate franchise; that is, as we understand it, franchise by act of incorporation."

What was said, therefore, is not in the nature of a limitation upon sec. 1, art. XI, but a limitation upon sub. 7, sec. 32, art. IV, of the constitution. The latter is limited so that it stands as a prohibition against the granting by special act of the franchise to exist as a corporation, but the former is unlimited and includes in its power of alteration and repeal all franchises of any kind which may at any period of its existence be conferred upon a corporation. And this has been the uniform application of sec. 1, art. XI. *West Wis. R. Co. v. Trempealeau Co.* 35 Wis. 257; *Whiting v. S. & F. du L. R. Co.* 25 Wis. 167; *Att'y Gen. v. Railroad Cos.* 35 Wis. 425; *State ex rel. Cream City R. Co. v. Hilbert,* 72 Wis. 184, 39 N. W. 326.

In *State v. Railway Cos.* 128 Wis. 449, 108 N. W. 594, this subject is decided and discussed at pages 505 to 508, and it was ruled in that case that an act of the legislature long after the corporation was organized and existing, conferring additional privileges upon the corporation and not at all limited to its right to exist as a corporation, was within the power reserved by sec. 1, art. XI. A like ruling was made in *Black River Imp. Co. v. Holway,* 87 Wis. 584, 59 N. W. 126; in *State ex rel. Cream City R. Co. v. Hilbert, supra;* in the *Water Power Cases,* 148 Wis. 124, 134 N. W. 330; in the opinion of this court in *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530; in *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925; and in a great number of cases in the supreme court of the United States. It seems strange that the decision in *Att'y Gen. v. Railroad Cos., supra,* should be so carelessly read as to draw from it inferences limiting the reserved power of alteration or repeal contrary to what was there decided, and to apply the restrictions there applied to sub. 7 of sec. 32, art. IV, in order to prevent the latter from limiting the reserved power so as to limit the reserved power itself.

Upon these considerations and upon the words of sec. 1862 I come to the conclusion that no power was conferred upon the municipalities mentioned to make an unalterable or irrepealable contract with the corporations or persons there qualified to become grantees, and hence that the municipality did not do so. There is a contract, but subject to alteration by the state in respect to rates. The *Railroad Commission* was acting within its powers in making the order in question so long as the order is not confiscatory in character. I may add that in this state corporations, while subject to this reserved power, are fully protected against spoliation, confiscation of property, or even injustice by the Fourteenth amendment to the federal constitution and the equivalent provisions in our state constitution. *Water Power Cases,* 148 Wis. 124,

134 N. W. 330. The natural persons behind the corporation, the shareholders, may be, under our constitution, deprived of any or all corporate powers or privileges, but not of the other acquired property of the corporation or of the use of such property in such manner as is lawful for natural and unprivileged persons. This property they may continue to enjoy as tenants in common, or they may, like other natural persons, incorporate under the general incorporation acts open to all. Thus, while the authority of the state is vindicated and its grants of power or privilege withdrawn or altered, none of the evils which the rule of the leading case in the federal supreme court was intended to guard against are possible under our system.

The following opinion was filed June 9, 1913:

MARSHALL, J. (*dissenting*). I have to dissent upon the ground that the result violates the prohibition against taking private property without rendering just compensation therefor and the impairment of contract obligations.

If there is a question firmly settled in this court, notwithstanding doubt is somewhat cast upon it by expressions in opinions, it is that an unconditional legislative privilege, not corporate, granted and accepted, is property which may be bought and sold like any other property, and can no more be taken away for public purposes without tendering just compensation therefor than any other thing of value. The confusion which found place in our opinions after *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, 460, between such a privilege and an act of incorporation was eliminated by *State ex rel. Att'y Gen. v. Portage City W. Co.* 107 Wis. 441, 83 N. W. 697, followed by *Pittsburg T. Lab. v. Milwaukee E. R. & L. Co.* 110 Wis. 633, 643, 86 N. W. 592; *Linden L. Co. v. Milwaukee E. R. & L. Co.* 107 Wis. 493, 498, 83 N. W. 851; *In re*

*Southern Wis. P. Co.* 140 Wis. 245, 258, 122 N. W. 801; *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 420, 130 N. W. 530; *Calumet S. Co. v. Chilton,* 148 Wis. 334, 370, 135 N. W. 131.

The suggestion sometimes made that a legislative privilege, not corporate, is within sec. 31, art. IV, of the constitution and within the reserve power of sec. 1, art. XI, relating to corporations, I am utterly unable to understand. Sec. 1, art. XI, does not deal at all with mere legislative privileges, but does deal with the creation of corporations and defining their powers. A grant thereunder is not inherently assignable. No constitutional regulation of power to grant mere privileges, not corporate, was ever supposed to be necessary. It has been common, from time immemorial, for sovereign authority to make such grants. It was with a new manner of granting corporate powers that sec. 31, art. IV, dealt. The term there "for granting corporate powers or privileges, except to cities" refers to the words "corporations without banking powers or privileges may be formed under general laws, but shall not be created by special act except for municipal purposes," in sec. 1, art. XI. The purpose of the latter section was to prevent the formation of mere private corporations by special act, except in special cases, while the amendment to sec. 31, art. IV, entirely prohibited the formation of such corporations except under the general law. Both sections deal with the same thing—the granting of privileges by act of incorporation, and not privileges which may be granted irrespective of any constitutional provision as was distinctly decided in *In re Southern Wis. P. Co., supra.*

So the question of whether the grant of a mere privilege, not corporate, is subject to alteration or repeal is to be solved by the terms of the grant, construed in the light of characterizing circumstances, not by any constitutional provision. It has been so repeatedly held here. *Chapin v. Crusen,* 31 Wis.

209; *Wright v. Milwaukee E. R. & L. Co.* 95 Wis. 29, 69 N. W. 791. It will be seen by these cases that whether any change in such a franchise as we have here, is legitimate, is referable solely to the terms of the grant. True, the court failed to distinguish, as it did later, between a franchise and a corporate franchise. But reading that distinction into the opinions they clearly hold that such a franchise, whether granted to a person or a corporation, is not subject to change except according to its terms, and such is the law necessarily.

We do not overlook the fact that in *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925, the court, *arguendo,* spoke of a franchise owned by a corporation, as a corporate franchise, and so under the reserve power; but I think that was unnecessary to the case and the merest inadvertence. It is clearly contrary to *In re Southern Wis. P. Co.* and all the other cited cases. It requires but a moment's reflection to appreciate that if such a privilege is really corporate and so within the reserve power, it cannot be granted to a corporation by special act at all,—the very question at issue in the *Southern Wis. P. Co. Case.* There the contrary in *Stevens Point B. Co. v. Reilly,* 44 Wis. 295, was overruled, and the logic of *State ex rel. Att'y Gen. v. Portage City W. Co.* 107 Wis. 441, 83 N. W. 697, and *Linden L. Co. v. Milwaukee E. R. & L. Co.* 107 Wis. 493, 83 N. W. 851, followed.

It is unfortunate that after all efforts made to distinguish between a franchise and a corporate franchise, the former governed by the terms of the grant and the latter by the constitutional reservation, confusion keeps cropping out, now and then, and even passes unnoticed for a time by those who have to deal specially in respect to it. I take a measure of this to myself, though I endeavored, with the concurrence of some of my brethren to whom I submitted the matter, to correct my inadvertence at the earliest possible moment. *Calumet S. Co. v. Chilton,* 148 Wis. 334, 370, 135 N. W. 131. I think all

said in the *Manitowoc Case* about a privilege under sec. 1862 of the Statutes being a corporate franchise subject to the constitutional right of alienation or repeal, is beside the case.

In this case there was a corporation in operation. The privilege was in no sense a corporate privilege. The opinion of the court practically concedes that. I am led to say what I have respecting the legislative power because the subject was advanced in this case and found some favor. However, the decision goes wholly on a construction of the statute. The idea is that, by a proper construction thereof, the right to regulate the charge for fares was not parted with by the legislature. I cannot agree with that.

It is conceded that it was competent for the state to make a bargain with the railway company as to the rate of fare to be charged and that such a bargain under legislative authority is within the constitutional guaranty against impairment, the same as one between private parties. The federal supreme court has spoken very decisively on that subject many times, particularly in *Detroit v. Detroit Citizens' St. R. Co.* 184 U. S. 368, 22 Sup. Ct. 410, and *Minneapolis v. Minneapolis St. R. Co.* 215 U. S. 417, 30 Sup. Ct. 118.

There was no constitutional prohibition in the way of the city of Milwaukee, by legislative authorization, bargaining with the street railway company as it is claimed to have done. That it possessed such authority in very plain language cannot well be gainsaid. What could be plainer than sec. 1862: "Any municipal corporation . . . may grant to any such corporation . . . upon such terms as the proper authorities shall determine, [the use] of any streets," etc. ? What could be plainer, *inter partes,* in ordinary matters ? Who would be bold enough to contend that the legislative intent was not to afford opportunity to make a contract so that a railway company could safely finance its operations ? Such certainly is as important to the public as to the railway company. The

uncertainty, in the experience of any street railway company as to whether it has anything which it can really count on, forms a large element of expense in many ways, which, in the end, has to be charged up to the investment and liquidated in the charges for service. The idea that the public really gains any advantage by holding over an investment in such property the disturbing uncertainty, is a great mistake. The best way to get the best of service at the lowest obtainable price is to remove just as far as possible, all dangers to the reasonable income paying quality of the investment.

Now conceding, as must be done, in view of the constitution and decisions here and in the federal supreme court, that the city of Milwaukee had authority by contract to confer upon the railway company authority to charge whatever fare it might see fit, up to a specified limit, was such contract made? That the adversary parties came together to make a contract, goes without saying, as it does that the dominant mutual idea was an exchange of equivalents. The railroad company surrendered certain things and incurred certain obligations on its side. The city in return promised the railway company enjoyment of a contract right to charge for fare, "not exceeding five cents," except for children, etc., the right to one transfer to be incident to each ticket and opportunity to be offered to patrons to purchase "tickets in packages of twenty-five for one dollar, or six for twenty-five cents," usable at certain times and within certain limits. Now that seems to me to be plain. Language which is plain from every viewpoint, does not admit of judicial construction. The mutual agreement that the company may charge specified rates for service, seems by necessary inference, to mean that at its option it may charge up to the maximum. If that were not the intention of the parties, what were they contracting for? The principal thing was matter of fare. All else depended on that. Would a company leave that to be changed at the

pleasure of the municipality, when it was the very foundation element of competency to economically finance its operation? It having relied thereon, and arranged all its financial matters accordingly, and investors having taken its securities in the same reliance, should the plain language of the contract between the parties be twisted out of the natural, ordinary meaning in the interests of municipal control?

There is much which might be written on this matter, but there is no good which can come from my doing so. I have assumed the cause would be removed to the federal supreme court, as it seems to me to be in conflict with the federal decisions. True, the court rests the matter on the construction of the statute, but if the construction is unreasonable from the standpoint of the decisions of the federal supreme court under substantially the same circumstances, as in my judgment it is, there can be no escape by means of statutory construction from the effect of violation of the constitutional guaranties. If that were not so, a very easy way would exist of violating such guaranties and defying the supreme judicial authority in respect to the matter.

I appreciate there is no purpose on the part of my brethren to circumvent the constitution. They have reached a conclusion as to the meaning of the statute which renders *Detroit v. Detroit Citizens' St. R. Co.* 184 U. S. 368, 22 Sup. Ct. 410, inapplicable. That is all there is to it. They have reached that conclusion by applying, in my judgment, the doctrine of *Chapin v. Crusen,* 31 Wis. 209, and similar cases away beyond their legitimate limits. After resolving all reasonable doubts in favor of the municipality, it yet seems clear to me that the very thing the street railway company, and the common council of the city as well, were after was settlement for a long period of the vexed question of fares. The records show, and it is a matter of public knowledge, that disputes as to fares for years have been

636 SUPREME COURT OF WISCONSIN. [May

Milwaukee E. R. & L. Co. v. Railroad Commission, 153 Wis. 592.

causing a very disturbed condition of affairs in Milwaukee. It had entered into the political activities of the city as no other question had, and doubtless rendered the future of the corporation so uncertain as to almost paralyze it as regards making advantageous arrangements for rehabilitation and extensions. The only thing to bring peace between the people and the corporation and enable the latter to perform its public duties in the most advantageous way to the public, was to stop, absolutely, for the length of time covered by the ordinance, the disputes over whether the rates of fare were reasonable or not. How can it be fairly said that the really prominent thing which led to the arrangement, sought to be disturbed by the rate commission under its assumption of authority, was not done at all?

Where did the *Railroad Commission* get its authority to supersede the contract? I appreciate the answer of the court's opinion is that it has not attempted to supersede a contract, but to enforce its terms; that, *not to exceed the ordinance limit as to fares,* left the field of activity to which the *Commission* succeeded as to what is a reasonable fare; that the meaning of the contract is the railway company shall be privileged to charge a reasonable fare not exceeding the stated rate. That comes back to the question of construction and concedes that if the construction be wrong the decision is wrong. It is appreciated that the law under which the *Railroad Commission* operated expressly reserved from the grant of administrative power, power to interfere with existing contracts which were not inherent in the corporate franchise. So if there was a contract, exempt from legislative interference, fixing the rate of fare as to the railway company, the *Railroad Commission* usurped authority in making the order complained of. If there was a contract which left the question open to investigation as to what was the reasonable fare it could charge, leaving the ascertainment of that a matter of

administration, then the *Commission* acted within the scope of its power.    I think the former is correct.

VINJE, J.    I concur in the foregoing opinion of Mr. Justice MARSHALL.

BARNES, J., took no part.